[Crim. No. 20910. First Dist., Div. One. Mar. 26, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
GROVER BLACKWELL, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Joel Kirshenbaum, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein and John H. Sugiyama, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ELKINGTON, Acting P. J.—Charged with four sex-related felonies and having waived a trial by jury, defendant Grover Blackwell was, by the superior court, found not guilty by reason of insanity as to each of the offenses and committed, December 18, 1978, to a state hospital under the provisions of Penal Code section 1026.

Effective September 28, 1979, section 1026 and its related statutes, sections 1026a and 1027, were reorganized by the Legislature, becoming Penal Code sections 1026, 1026.1, 1026.2, 1026.5 and 1027.

Thereafter, in proceedings under the newly effective section 1026.2 (substantially similar to the earlier § 1026a) Blackwell, in the superior court, sought his discharge from the state hospital on "the ground that his sanity had been restored." Following an appropriate hearing a jury found that his "mental state has not improved to the extent that he is no longer a danger to the safety of others or himself." He was thereupon, January 9, 1980, recommitted to the state hospital.

Blackwell's appeal is from the order of January 9, 1980.

Blackwell first contends: "The trial court committed reversible error in instructing on the standard of proof to be applied at appellant's Penal Code section 1026a/1026.2 hearing. A. The erroneous inclusion of the term 'or himself.' B. The inappropriate and overly broad definition of 'dangerous.'"

We initially consider what Blackwell characterizes "The erroneous inclusion of the term 'or himself.'"

The Penal Code has long provided, in effect, that one found not guilty by reason of insanity, of a crime of violence, shall under certain circumstances be confined in a state hospital for a minimum of 90 days before he may be released. Former Penal Code section 1026a and its successor statute, section 1026.2, have at the same time provided that a person so confined may apply to the superior court for his release therefrom after section 1026's 90-day period, on "the ground that his sanity has been restored, . . ." Neither section 1026a nor section 1026.2 has stated the criteria for determining whether the sanity of the person so committed has been restored.

Upon Blackwell's Penal Code section 1026.2 proceedings, the superior court's instructions advised the jury that in order to establish that he had regained his sanity, he had the burden of proving "that he is no longer a danger to the safety of others *or himself.*" (Italics added.) Thereafter, the jury's verdict found that Blackwell's mental state had *not* "improved to the extent that he is no longer a danger to the safety of others *or himself.*" (Italics added.)

The instant argument is that the Legislature, by its September 28, 1979, reorganization, had *removed* the requirement, in order to establish restoration of his sanity, that Blackwell must convince the jury that he was no longer a danger to the *safety of himself.*

We find in the reorganized Penal Code sections some (three) suggestions that a person committed as was Blackwell, shall be discharged if he no longer "poses a serious threat of bodily harm to another person." More often the same statutes simply provide for release when "his sanity shall have been finally determined...."

In our resolution of the problem we are aided by three cases of the state's high court.

In *In re Slayback* (1930) 209 Cal. 480 [288 P. 769], Ms. Slayback, situated as was Blackwell, had sought her discharge under Penal Code section 1026a. In fashioning the test for such a release that court held, in effect, that such persons would have recovered their sanity when "they become no longer a menace to the public nor dangerous to themselves." Following earlier authority, the court had reasoned: "It often becomes necessary to take into custody those who are mentally afflicted and detain them until they become no longer a menace to the public *nor dangerous to themselves.* 'Nothing can be clearer than the duty of the state to restrain and confine the insane, *not only for their own safety and protection*, but for the safety and protection of the public.... It is a necessity growing out of the inability of the mentally afflicted to *care for themselves* or prevent injury to others.'" (209 Cal., p. 490; italics added.)

In *In re Franklin* (1972) 7 Cal.3d 126, 145 [101 Cal.Rptr. 553, 496 P.2d 465], the court stated: "Both petitioner and the People join in the proposition that the relevant standard under section 1026a is not whether the person committed is no longer legally insane, but whether he has improved to the extent that he is no longer a danger to the health and safety of others, *including himself....* We adopt the foregoing standard as applicable to proceedings under section 1026a." (Italics added.)

More recently, *In re Moye* (1978) 22 Cal.3d 457, 462 [149 Cal.Rptr. 491, 584 P.2d 1097], has held: "Although section 1026a is silent regarding the appropriate standard for determining whether one's 'sanity' has been restored, we have recently held that the proper test 'is not whether the person committed is no longer legally insane, but whether

he has improved to the extent that he is no longer a danger to the health and safety of others, *including himself. . . .'* . . .Persons committed under section 1026 may discharge this burden by establishing 'by a preponderance of the evidence, that they are no longer a danger to the health and safety *of themselves* or others.'" (Italics added.)

*Following* the statutory revisions at hand the state's Courts of Appeal have held: "If the defendant is ordered committed then after 90 days he is entitled to a hearing to determine whether he remains a danger *to himself* or others and if not then he is entitled to his release. (Pen. Code, § 1026.2.)" (*People* v. *Froom* (1980) 108 Cal.App.3d 820, 832 [166 Cal.Rptr. 786]; italics added.) "The proper test to determine whether the person committed is sane is to determine whether he has improved to the extent that he is no longer a danger to the health and safety of others, *including himself. . . .*" (*People* v. *Balderas* (1980) 104 Cal.App.3d 942, 946, fn. 5 [164 Cal.Rptr. 275].)

■ "[I]t is not to be presumed that the legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication." (*County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 644 [122 P.2d 526].) It must reasonably be said that the 1979 reorganization of the subject statutes gave no clear indication of a legislative intent to change the criteria for continued commitment of a violent offender found not guilty by reason of insanity.

Statutes must be reasonably interpreted. (*Regents of University of California* v. *Superior Court* (1970) 3 Cal.3d 529, 536-537 [91 Cal. Rptr. 57, 476 P.2d 457].) It is unreasonable, we think, to ascribe to the Legislature a purpose that one committed upon a finding of not guilty by reason of insanity, whose release, because of a mental condition, would pose a *danger to himself,* should nevertheless be discharged from custody.

Moreover, we find no substantial disaccord between the abbreviated language upon which Blackwell relies, i.e., "that he is no longer a danger to the safety of others," and that of *Franklin, supra,* 7 Cal.3d 126, and *Moye, supra,* 22 Cal.3d 457, i.e., "that he is no longer a danger to the health and safety of others, including himself."

■ We conclude that the law as stated by *Franklin* and *Moye* retains its vitality, and that Blackwell's instant argument is meritless.

■ We pass on to the second of Blackwell's claims of instructional error, "The inappropriate and overly broad definition of 'dangerous.'"

Although Blackwell now contends "that it was improper for the court to attempt to define the term 'dangerous' at all," it was upon his request that the trial court gave such a definition.

The jury were instructed: "A person is dangerous when he is likely to cause injury or pain. A person is dangerous when he may be reasonably likely to expose himself or others to injury."

We find no fault with the definition. (See Webster's New Internat. Dict. (3d ed. 1965) p. 573.)

■ Blackwell's remaining appellate contention is that: "The trial court committed reversible error in denying appellant's motion to either compel the prosecutor to produce the Atascadero records relied upon by Dr. Nemeth or strike the entire testimony of Dr. Nemeth."

Blackwell had been committed to the state hospital at Atascadero. As noted, he had by a Penal Code section 1026.2 petition sought his discharge on "the ground that his sanity had been restored." The superior court hearing date had been set for Tuesday, January 8, 1980, and a deputy public defender, manifestly experienced in such matters, was appointed to represent Blackwell. The public defender was "aware of the fact that a doctor was going to be testifying from Atascadero," and that he would be testifying on the basis of his own observations of Blackwell and certain of the hospital's records. A pretrial hearing was held on Friday, January 4, at which the hearing's issues and related matters were discussed. The public defender gave no indication at the time that he was interested in securing hospital records, which the expected doctor witness would have read and which he could readily bring with him.

Dr. Nemeth of, and residing at, Atascadero State Hospital appeared as a witness at the following Tuesday's hearing before a jury. It was soon made clear that he had recently reviewed, and had refreshed his memory from many of the hospital's records relating to Blackwell going "back to about seven years, . . ." The records were patently kept in different books, and files, and places, and consisted of interviews with Blackwell, and reports of his hospital history, medical and psychiatric evaluations, nurses' and technicians' reports, medications furnished, and

illnesses suffered. They consisted also of the "daily charts or the weekly charts of the other people who are involved in the treatment of Mr. Blackwell."

In the late afternoon the People rested, and the hearing was recessed to the following morning for cross-examination of the doctor. Neither Blackwell nor his attorney had made request for, or even mentioned, production of any hospital records used by the doctor to refresh his memory. If requested they could undoubtedly have been produced the next day.

Upon the next morning's convening of the court the doctor, who was the last of the hearing's witnesses, was cross-examined by the public defender. It was soon reiterated that the doctor had looked at the hospital records to refresh his recollection. The cross-examination was diverted to a lengthy review of his personal knowledge and observation of Blackwell. The public defender then announced: "Those are all the questions I have based on my notes. . . . I still have other cross-examination based on those records. . . . I want the records." A formal motion was then made: "My motion is to have those records *at this time*." (Italics added.) The records were not then available, and their production would entail delay, and a continuance of the hearing.

The trial court denied the motion.

The public defender thereupon announced: "Then I would make a motion to strike the entire testimony of the doctor, based on my lack of opportunity to cross-examine." That motion also was denied.

The jury arguments, instructions, deliberation, and findings followed, and were concluded on the same day.

Blackwell predicates his instant claim of error upon the trial court's failure to strike "the entire testimony of the doctor, . . ."

Evidence Code section 771, in relevant part and as relied upon by Blackwell, provides as follows: "[I]f a witness, either while testifying or prior thereto, uses a writing to refresh his memory with respect to any matter about which he testifies, such writing must be produced at the hearing at the request of an adverse party and, unless the writing is so produced, *the testimony of the witness concerning such matter shall be stricken*." (Italics added.)

Relevant also, we think, to this issue is Penal Code section 1050 which states: "The welfare of the people of the State of California requires that all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time. To this end the Legislature finds that the criminal courts are becoming increasingly congested with resulting adverse consequences to the welfare of the people and the defendant. *It is therefore recognized that both the people and the defendant have the right to an expeditious disposition, and to that end it shall be the duty of all courts and judicial officers and of all counsel, both the prosecution and the defense, to expedite such proceedings to the greatest degree that is consistent with the ends of justice....*" (Italics added.)

It is clear that in a proper case a party is entitled under Evidence Code section 771 to have a witness' testimony stricken upon refusal to produce a writing used to refresh his recollection. But it is equally clear that a party may not intentionally manipulate judicial processes to unnecessarily force upon the trial judge an election to follow Penal Code section 1050 *or* apply the stricture of Evidence Code section 771.

As said in *People* v. *Floyd* (1970) 1 Cal.3d 694, 707 [83 Cal.Rptr. 608, 464 P.2d 64] (cert. den. 406 U.S. 972 [32 L.Ed.2d 672, 92 S.Ct. 2418], disapproved on other grounds *People* v. *Wheeler* (1978) 22 Cal. 3d 258, 287, fn. 36 [148 Cal.Rptr. 890, 583 P.2d 748]): "He may not ... force a trial court to choose between the two demands, in the hope that a reviewing court will find that the trial court has made the wrong choice. 'We cannot tolerate such bad faith and we are not constitutionally required to do so.'"

"'[T]he trial court must in the nature of things have some control over such matters, to the end that judicial business may be dispatched in an orderly manner; ...'" (*People* v. *Thomas* (1962) 58 Cal.2d 121, 131 [23 Cal.Rptr. 161, 373 P.2d 97] [cert. den. 371 U.S. 231 (9 L.Ed. 2d 495, 83 S.Ct. 327)].)

The record before us reasonably suggests the conclusion, as impliedly found by the trial court, that Blackwell's and his public defender's purpose was *not* to secure production of the absent hospital records, but rather "'in all likelihood, to manufacture an appealable issue.'" (See *People* v. *Gaynor* (1963) 223 Cal.App.2d 575, 582 [36 Cal.Rptr. 219].)

No error or abuse of discretion is observed in the trial court's ruling.

It is notable also that Blackwell is now entitled, *as a matter of law*, to another hearing and determination of the question whether his sanity has been restored (see Pen. Code, § 1026.2), which is neither less, nor more, than that which he seeks by this appeal.

The order of January 9, 1980, recommitting Blackwell to the state hospital is affirmed.

Newsom, J., concurred.

**GRODIN, J.**—I concur out of deference to the dicta contained in the Supreme Court decisions cited in the principal opinion.[1] Were it not for that dicta I would agree with Blackwell that the proper standard for determining his right to release under Penal Code section 1026.2 is whether he is dangerous to the health and safety of *others*. Should he be dangerous to *himself*, he would be subject to involuntary civil commitment under the Lanterman-Petris-Short Act (LPS) (Welf. & Inst. Code, § 5000 et seq., § 5150), which contains substantially different (and less restrictive) provisions relating to location, nature and length of commitment and procedures for release. The Legislature seems quite capable of distinguishing between the two standards (cf. Pen. Code, §§ 1602, subd. (a), 1603, subd. (a), 1609, and 1611, subd. (a) with Welf. & Inst. Code, §§ 6500, 5150), and the distinction finds support in reason. It strikes me as anomalous that a person presently dangerous only to himself should be treated in a more restrictive manner than another person with the same tendencies simply because he was committed for a different reason. To do so is "to allow the remedy to exceed the cause of special treatment." (Hamann, *The Confinement and Release of Persons Acquitted by Reason of Insanity* (1966-1967) 4 Harv.J.Legis. 55, 83; Szasz, Law, Liberty and Psychiatry (1963) p. 229.)

Appellant's petition for a hearing by the Supreme Court was denied June 24, 1981.

---

[1]Neither *In re Franklin* (1972) 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465], nor *In re Moye* (1978) 22 Cal.3d 457 [149 Cal.Rptr. 491, 584 P.2d 1097], involved the issue presented here, nor is that issue discussed in those opinions.