[No. A019321. First Dist., Div. Three. Dec. 30, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM EDWARD MAPP, Defendant and Appellant.

COUNSEL

Judith R. Cohen, under appointment by the Court of Appeal, and Bushnell, Caplan, Fielding & Rudy for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Morris Lenk and Nathan D. Mihara, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FEINBERG, J.**—On this appeal from an order of recommitment in a Penal Code section 1026.2[1] proceeding, the major question is whether appellant was deprived of a right of constitutional dimension,[2] because the court directed the jury to find that appellant's sanity had not been restored. We affirm.

The facts are not in dispute. In June 1979 appellant was charged with assault upon a correctional officer with a deadly weapon or by means of force likely to produce great bodily injury, while in state prison (§ 4501) and inflicting great bodily injury (§ 12022.7). On July 19, 1979, the court suspended all proceedings after finding that appellant was insane and committed him to the California Medical Facility in Vacaville (CMF). In November 1979 the criminal proceedings were resumed and a second information filed. On May 15, 1980, appellant was found not guilty by reason of insanity and returned to CMF.

In February 1981, pursuant to appellant's first petition for a restoration of sanity hearing (§ 1026.2), a jury trial commenced to determine whether appellant's sanity had been restored. Pursuant to the court's order, the jury found that appellant's sanity had not been restored and that he constituted a danger to himself and others.

On January 19, 1982, appellant filed a second petition for restoration but in May, withdrew it without prejudice. Pursuant to the recommendations of the psychiatrists who examined him, appellant was transferred to Napa State Hospital (Napa). After the Napa staff recommended a retransfer to Atascadero State Hospital (Atascadero), appellant's petition for restoration was renewed and set for a jury trial on July 6, 1982. After appellant rested his case, and over his objection, the court granted the People's motion for a directed verdict. The jury returned the verdict as directed. The court thereupon ordered appellant recommitted to Atascadero. This appeal ensued.

The parties agree that appellant had the burden of proving by a preponderance of the evidence that he was no longer a danger to the health and safety of others, including himself. (*People* v. *Franklin* (1972) 7 Cal.3d 126, 147 [101 Cal.Rptr. 553, 496 P.2d 465]; *People* v. *Blackwell* (1981)

---

[1] All future references are to the Penal Code.

[2] Although Penal Code section 1026.2 provides for an annual review hearing we have been informed by the parties that Mr. Mapp has made no reapplication this year. Even assuming that the instant order is technically moot, the matter poses an issue of broad public interest which is likely to occur. We therefore exercise our inherent discretion to resolve the issue on the merits. (Cf. *In re Lee* (1978) 78 Cal.App.3d 753, 756 [144 Cal.Rptr. 528].)

117 Cal.App.3d 372, 377 [172 Cal.Rptr. 636].) This controversy focuses on whether in the absence of specific statutory authorization and in light of *Franklin, supra,* 7 Cal.3d 126, the trial court had the power to take the issue from the jury, and if so, whether it properly did so on the basis of the evidence adduced by the appellant at the 1982 hearing.

In *Franklin, supra,* our Supreme Court upheld the constitutionality of the 90 day commitment procedure of former section 1026a (the predecessor of § 1026.2) and on equal protection grounds held that the constitution afforded a jury trial if requested, with the preponderance of the evidence standard. The court further stated that "principles of equal protection and fairness require that persons in petitioner's class[3] be given the advantage of . . . a three-fourths verdict, so that they may obtain their release to society *upon establishing to the satisfaction of at least three-fourths of the jurors* that they no longer constitute a danger to the health or safety of themselves and other persons." (*Franklin, supra,* at p. 149; italics added.)

Appellant relies on *People* v. *Coleman* (1978) 86 Cal.App.3d 746 [150 Cal.Rptr. 415], in which this court (Division One) rejected a contention that in the absence of a defendant's affirmative request that a jury be impaneled in a section 1026.2 proceeding, he is entitled to the correlative right of a nonjury or court hearing traditionally applicable to special proceedings civil in nature, as follows: "While it is true that a hearing on an application for release on the ground of restored sanity, paralleling other involuntary commitment procedures, constitutes a special proceeding for which no right of jury trial attaches by statute, the fact that equal protection considerations justify a similar safeguard 'should . . . [the defendant] request it' (*In re Franklin, supra,* 7 Cal.3d 126, 148-149), does not result in an equivalent *right to a nonjury trial* simply by reason of a defendant's failure to make such request or express waiver. (Cf. *People* v. *King* (1970) 1 Cal.3d 791, 795 [83 Cal.Rptr. 401, 463 P.2d 753] [cert. den. 406 U.S. 972 (32 L.Ed.2d 672, 92 S.Ct. 2418)] *Singer* v. *United States* (1965) 380 U.S. 24, 35 [13 L.Ed.2d 630, 638, 85 S.Ct. 783].)" (86 Cal.App.3d at p. 751, fns. omitted.) Pointing to the "indicia peculiar to a criminal action" (i.e., caption and trial in a criminal department), the *Coleman* court saw no error or unfairness to the defendant in requiring the People to join in the defendant's express waiver as in criminal proceedings, and saw no valid reason to preclude such a salutory prophylactic requirement that served to protect rather

---

[3]At page 147, the Supreme Court explained that the special interest which the public has acquired in the confinement and release of people in this exceptional class results from the fact that there has been a judicial determination that they have already endangered the public safety and their own as a result of their mental conditions as distinguished from those civilly committed because of only potential danger.

than restrict the constitutional right extended to the defendant. (*Coleman, supra,* at pp. 751-752.)

■ Appellant relies on both *Franklin, supra,* and *Coleman, supra,* to argue that in the absence of specific statutory authorization the judicially created right of constitutional dimension, to a jury trial in section 1026.2 proceedings created by *Franklin* precludes the directed verdict procedure here utilized by the trial court.

■ In civil proceedings, the directed verdict procedure is not expressly mandated by statute, but is indirectly recognized by the statutes pertaining to a motion for judgment notwithstanding the verdict. (4 Witkin, Cal. Procedure, (2d ed. 1971) Trial, § 352, p. 3151; Code Civ. Proc., §§ 629, 630;[4] *Dailey* v. *Los Angeles Unified School District* (1970) 2 Cal.3d 741, 745 [87 Cal.Rptr. 376, 470 P.2d 360].) ■ Thus the absence of a reference to a motion for a directed verdict in section 1026.2 is not controlling.

Nor does it necessarily follow that since Penal Code section 1026.2 is a special proceeding characterized by some features and indicia peculiar to a criminal action, there can be no directed verdict. ■ As the People point out, even though in a criminal action they have a right to a jury trial,[5] a defendant may move for acquittal for insufficiency of the evidence at the close of the prosecution's case in chief before the cause is submitted to the jury. If granted, the judgment is not appealable and is a bar to further prosecution. (Pen. Code, §§ 1118.1, 1118.2[6] *People* v. *Ricketts* (1970) 7 Cal.App.3d 441, 446 [86 Cal.Rptr. 647].) ■ Similarly, a criminal defendant is precluded from presenting to a jury defense such as unconsciousness (*People* v. *Barrick* (1982) 33 Cal.3d 115, 132 [187 Cal.Rptr. 716, 654 P.2d 1243]), diminished capacity (*People* v. *Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513]), entrapment (*People* v. *Barraza* (1979) 23 Cal.3d 675, 691 [153 Cal.Rptr. 459, 591 P.2d 947]), where there is insufficient evidence from which a reasonable jury could conclude that the particular facts underlying the instruction requested exist.

Thus a form of directed verdict is a well established feature of both our civil and criminal procedure. Further, *People* v. *Conrad* (1982) 132

---

[4]So far as pertinent, both of these sections authorize judgment "whenever a motion for a directed verdict . . . should have been granted had a previous motion been made.

[5]The nature and scope of this right is, however, unclear. (See *People* v. *Sims* (1982) 32 Cal.3d 468, 483, fn. 13 [186 Cal.Rptr. 77, 651 P.2d 321].)

[6]Before the enactment of this statutory procedure by Statutes 1967, chapter 256, section 3, page 1406, a motion for directed verdict was the procedure for raising insufficient evidence of guilt. (See *People* v. *Ives* (1941) 17 Cal.2d 459, 465 [110 P.2d 408]; *People* v. *Rose* (1930) 110 Cal.App. 648, 654 [294 P. 487].)

Cal.App.3d 361, 368 [182 Cal.Rptr. 912] held that given the civil nature of a section 1368 competency proceeding, a trial court had jurisdiction to render a judgment notwithstanding the verdict. Similarly, here, that (1) petitioner, appellant here, has the burden of proof, (2) the preponderance of the evidence standard and (3) the three-fourths jury verdict demonstrate the inherently civil nature of a section 1026.2 proceeding.[7] ■ We conclude that by creating the judicially created right of constitutional dimension to a jury when requested in 1026.2 proceedings, *Franklin* does not preclude a directed verdict where the insufficiency of the evidence warrants it.

The next question is whether the procedure was properly utilized here. ■ In considering whether there was error in granting of the directed verdict, we must view the evidence in the light most favorable to appellant and indulge in every legitimate inference that may be drawn from the evidence in his favor and disregard conflicting evidence to determine whether there was evidence of sufficient substantiality to support a verdict that appellant was no longer a danger to others or himself. (*Dailey* v. *Los Angeles Unified School Dist.*, supra, 2 Cal.3d 741, 745.)

Appellant's only witnesses at the 1982 hearing were Dr. M.L. Eiland, a staff psychiatrist at Napa and Mrs. R.C. Hayes, a registered nurse and program director at the same facility.

Dr. Eiland had examined appellant twice in 1979,[8] and concluded that he was not capable of standing trial and probably not legally sane at the time of the offense, as the jury ultimately found in 1980.

At the time of Dr. Eiland's most recent examination (Apr. 19, 1982) there was no overt evidence of psychosis. However, Dr. Eiland was not willing to opine that appellant had recovered his sanity, on the basis of appellant's history and appellant's involvement in two serious similar episodes of assaultiveness at Atascadero in February and November 1981. The Atascadero

---

[7]So far as here pertinent, article I, section 16 of the state Constitution provides: "Trial by jury is an inviolate right and shall be secured to all, *but in a civil cause three-fourths of the jury may render a verdict. A jury may be waived in a criminal cause by the consent of both parties expressed in open court* by the defendant and the defendant's counsel. In a *civil cause* a jury may be *waived by* the *consent of the parties* expressed as prescribed *by statute.*" (Italics added.)

[8]On June 15, 1979, Dr. Eiland described appellant as being a paranoid schizophrenic, a "very serious mental condition characterized by periods of psychosis and periods of remission." At that time, appellant was generally paranoid, had an "extremely suspicious approach to the world" and delusional thinking, and talked about hallucinations (*ibid.*).

On December 3, 1979, appellant talked about "frequently hearing the voice of God, and . . . about conversing with God." Appellant seemed to have a fixed belief in demons and of the feeling that a number of people that he had dealt with at CMF were demons or people with hostile, diabolical intent toward him; the demons had been sticking knives into him.

staff noted that appellant was not taking part in the treatment program and it opposed appellant's release. Dr. Eiland also felt that appellant was not giving him "completely frank answers." For example, during the April 1982 examination appellant denied that he had ever hallucinated. Dr. Eiland explained the purpose of his interview and believed that appellant understood. Dr. Eiland stated that he did not always expect to be able to directly see the psychosis in a potentially dangerous person.

Dr. Eiland explained there are periods in which a paranoid schizophrenic is psychotic and other times when he is not. In 1982, Dr. Eiland testified that he "would still consider appellant to be a paranoid schizophrenic." (*Ibid.*) Although appellant had improved substantially and was in "remarkably good shape," the improvement could be the result of a remission or Navane, a "major tranquilizer" that appellant was taking. The drug tends to make people less delusional and it helps them to cope with hallucinations. On the basis of all of the information available, Dr. Eiland opined that appellant still had not recovered his sanity.

Ms. Rheda Hayes confirmed Dr. Eiland's conclusion. She testified that appellant came to Napa from Atascadero on March 24, 1982, and had been in the most secure ward since then. It is a small ward with a high number of staff. Although appellant had not been physically assaultive while on that ward, the hospital staff put very little pressure on him and allowed him to stay in bed until noon. When on rare occasions, they chose to wake him up, appellant became hostile, swore, screamed and yelled, and in general, threw a tantrum. When appellant was required to take part in a treatment program on the ward or a conference with a rehabilitation therapist from the other staff, he would yell and swear. As he would not participate in a treatment program, the staff did not make any demands on him.

Appellant points only to Dr. Eiland's statement that he never thought of appellant as a danger to himself, and ignores Dr. Eiland's conclusion that appellant had not recovered his sanity and constituted a danger to others, including himself. In proceedings of this kind testimony of a mental health expert often is the only way to establish whether the requisite dangerousness exists. (Cf. *People* v. *Bennett* (1982) 131 Cal.App.3d 488, 497 [182 Cal.Rptr. 473].) Given certain facts, predictions of future dangerousness may be rationally projected and the drawing of such an inference is properly within the expertise of a qualified mental health expert like Dr. Eiland.[9] (Cf. *People* v. *Henderson* (1980) 107 Cal.App.3d 475, 486 [166 Cal.Rptr. 20].) As an appellate court we cannot determine where the preponderance

---

[9]It is to be remembered here that we are concerned with an individual who has, in fact, engaged in dangerous assaultive conduct while insane.

of the evidence lies, but determine only whether there is evidence of ponderable legal significance. ■ The term "substantial evidence" is not synonymous with any evidence, but refers to evidence reasonable in nature, credible and of solid value. (Cf. *In re Corey* (1964) 230 Cal.App.2d 813, 823-824 [41 Cal.Rptr. 379].)

■ Given Dr. Eiland's testimony, we conclude that the trial court properly directed the verdict. (Cf. *People* v. *Mallory* (1967) 254 Cal.App.2d 151, 156-157 [61 Cal.Rptr. 825].)

We need not and therefore do not reach the parties' contentions concerning the propriety of the trial court's ruling that if appellant took the stand his prior (1973) murder conviction would be admissible for purposes of impeachment pursuant to article I, section 28, subdivision (f).

The order is affirmed.

White, P. J., and Barry-Deal, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 15, 1984. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.