[No. B005940. Second Dist., Div. Seven. Nov. 9, 1984.]

ZEF RUBIN HOCHHEISER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

778

■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Richard S. Plotin and Dennis A. Fischer for Petitioner.

No appearance for Respondent.

Robert H. Philibosian and Ira Reiner, District Attorneys, Harry B. Sondheim and Richard W. Gerry, Deputy District Attorneys, for Real Party in Interest.

**OPINION**

**THOMPSON, J.**—Petitioner Zef Hochheiser seeks a writ of prohibition restraining the superior court from enforcing its order directing the taking of the complaining victims' testimony by closed-circuit television from outside the courtroom. Petitioner contends the order constitutes an impermissible invocation of judicial power to create procedural rules unauthorized by statute which seriously risk encroaching on his constitutional rights.

This case presents an issue of first impression in this state concerning the power of the trial court, in the absence of specific statutory enabling legislation, to promulgate radically new procedures for the alleged minor victims to testify at trial via closed-circuit television. For the reasons to follow, we will conclude that the trial court exceeded its authority in departing from established criminal trial procedures and, accordingly, grant the writ.

*Facts*

Petitioner faces trial on two counts of lewd conduct with a minor under age 14 (Pen. Code, § 288, subd (a)). The minors, T. B. (count I) and S. W. (count II) testified at the preliminary hearing, which was held on December 1 and 2, 1982. Following petitioner's not guilty plea at arraignment, various pretrial motions were considered and continuances were granted.

On June 14, 1984, the day the matter was called for trial and jury selection began, the prosecutor orally requested that the complaining witnesses be allowed to testify via closed-circuit television from the jury room, instead of in open court. The prosecutor referred to a procedure used in a preliminary hearing and suggested a particular company to provide equipment and personnel for the closed-circuit television procedure. He indicated that the witness would be able to see the defendant and the cross-examiner, and the defendant would be able to see the witness. Defense counsel objected, stating that the procedure would deprive petitioner of a fair trial and that he had no notice.

The following day, further proceedings on the motion were conducted. The prosecution presented testimony by the victims' parents in support of the motion, to show that the closed-circuit television was necessary to prevent psychological harm. The father of 10-year-old T. B. testified that at the time of the preliminary hearing (Dec. 1982), his son, who was "shy about his private parts," had said that he did not want to talk about the incident in front of a lot of people. After the preliminary hearing, T. B., whose prior bed-wetting and nighttime problems had improved, "went through . . . several nights of nightmares and and a round of bed-wetting," which then tapered off. The father stated he had not discussed with the son, for over a year, anything about testifying in court.

The mother of eight and one-half to nine-year-old S. W. testified that when her son exited the courtroom after his 1982 preliminary hearing testimony, he was "totally distraught . . . in tears and couldn't . . . talk," and "started reverting back to baby-like behavior," such as wanting to wear diapers. When she told him the week before the June 15, 1984, hearing that he would be coming to court to testify, he burst into tears and went up to his room, indicating there was no way he was going back to court and that if he did come to court he would say, "I don't know anything." She claimed he started to talk baby talk and picked up a diaper that his mother was using as a rag, and waved it at her. He seemed to be eating less which concerned her because he has cystic fibrosis.

The mother also testified that she had suggested to the prosecutor the possible use of closed-circuit television. She stated, on direct examination, that when she mentioned to her son the possibility of testifying over closed circuit, where there would not be a lot of people around, and asked if he would agree to this procedure, he "didn't say anything" and was still crying although he seemed more relaxed. On cross-examination she admitted that in fact he never reacted one way or the other to the idea of closed-circuit television.

Although both boys had been taken by their parents to psychiatrists, no psychiatric evidence was offered.

At the June 15 hearing, defense counsel argued that (1) the court lacked statutory authority to promulgate the anticipated procedure; (2) the procedure would violate petitioner's constitutional rights to public trial, confrontation and due process; and (3) the showing made by the People was insufficient to justify the invocation of this procedure. The prosecutor argued that (1) the court had power under Evidence Code section 765 to control the manner and mode of presenting proof, and (2) petitioner's constitutional rights would not be infringed since the television equipment would enable the jury, judge and counsel to contemporaneously view the proceedings in the anteroom and would permit the defendant and witnesses to see each other. The court stated: "I believe there is some legislation pending to codify this whole idea going on. That is apparently a new phenomenon that is developing. We all know it is being used."

Following argument by counsel, the court granted the People's motion. The court stated: "I think under Evidence Code [section] 765 the court has the right to control the mode of interrogation of witnesses and the Civil Code talks about modes being affidavits, deposition and oral examination.

"Then [section] 2005 of the [Code of Civil Procedure] talks about what oral examination is and again talks about presence of jury or tribunal and which is the deciding fact or act upon the testimony being heard by the jury or tribunal from the lips of the witness. That is out of C.C.P. 2005.

"I would suggest that lips of the witness would be viewable by a television, and I think it would be an open hearing. I think based upon what has been submitted to me, I think that it would be within the discretion of the court under 765 to allow this type of procedure for these two witnesses.

"The purpose of 765 is to help the trier of fact ascertain the truth and to protect witnesses from undue embarrassment or harassment, and I think as well as protecting the rights of the defendant.

"I think all of this can be done under this procedure, and I will allow that.

"Mr. Plotin [Counsel for petitioner]: Is it 765 of the Evidence Code the court is using as the authority?

"The Court: No. I still think inherently the court has power to control the courtroom and develop procedures that come up that cover instances that come up, and this is a whole new thing, and I think we never had fourteen or fifteen years ago.

"Now we have to be and can do things we couldn't do before.

"I have no doubt watching a spaceman in a shuttle that I am actually watching a person and no doubt in my mind we can develop a procedure here so the jury is convinced that it is the child testifying without any undue influence.

"I think it protects the rights of the defendant to open court and due process and to confront the accused and to be confronted by the witness as well.

"I am going to allow that."

Defense counsel's motions for a mistrial and for a continuance to bring up a writ were denied. Immediately after the court's ruling, selection of the jury resumed. Subsequently, because of defense counsel's hospitalization, a mistrial was declared and the jury panel was discharged. In response to this petition, we stayed petitioner's trial and issued an alternative writ of prohibition.

I

*Lack of Inherent Power*

██ Petitioner challenges the trial court's authority to promulgate this radically new procedure which substitutes closed-circuit television for the long established in-court examination of the state's principal witnesses. We agree.

The trial court acknowledged the lack of explicit legislative authority for its order and claimed it was relying on its inherent power to control the courtroom and develop new procedures. We believe that such a far-reaching innovation in a criminal trial "is more appropriately left to the Legislature for initial consideration." (*People* v. *Collie* (1981) 30 Cal.3d 43, 54 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].)

While this appears to be the first case in California on the use of closed-circuit television in a criminal trial,[1] our Supreme Court has addressed the

---

[1]*Eversole* v. *Superior Court* (1983) 148 Cal.App.3d 188 [195 Cal.Rptr. 816], refers to closed-circuit television in the context of a preliminary hearing.

Moreover, our research has discovered only one case, *Kansas City* v. *McCoy* (Mo. 1975) 525 S.W.2d 336 [80 A.L.R.3d 1203], to date, which has considered the propriety of allowing witnesses to be examined over closed-circuit television. There, the Missouri Supreme Court by a four-to-three decision allowed the admission into evidence of an expert witness' testimony from his offices via closed-circuit television in a case involving a violation of a municipal ordinance, a proceeding civil in nature although criminal with regard to certain procedural requirements. We agree with the criticism of the *McCoy* decision by the 8th Circuit that "[a]mong the more disturbing aspects of the decision is that there was no showing of extraordinary circumstances necessitating reliance on the procedure." (*United States* v. *Benfield* (8th Cir. 1979) 593 F.2d 815, 822, fn. 11.)

issue of the inherent power of a court to adopt novel criminal procedures in the analogous contexts of a nonstatutory notice of alibi (*Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834 [117 Cal.Rptr. 437, 528 P.2d 45]) and prosecution discovery of defense witnesses' statements (*People* v. *Collie, supra,* 30 Cal.3d 43). The court explicitly recognized "the original primacy of the Legislature in the field of creating rules of criminal procedure" (*id.,* at p. 54), pointing out that the court "has not been vested with formal, quasi-legislative, rule-making power, either by the California Constitution or the Legislature" (*Reynolds* v. *Superior Court, supra,* 12 Cal.3d at p. 849).

In *Reynolds, supra,* our Supreme Court observed that "complex and closely balanced questions of state and federal constitutional law [were] presented" and concluded that "such a procedural innovation as requiring defendants in criminal cases to give advance notice of alibis should be introduced, if at all, only upon the considered judgment of the Legislature." (*Id.,* at p. 837.)

In explaining the need for judicial restraint, the *Reynolds* court emphasized the dichotomy between judicial rulemaking inspired or required by constitutional limitations on the power of government and judicial rulemaking which would merely grant to the government rights which it might legislatively claim for itself. (*Id.,* at p. 846.) The unanimous court explained: "We see little to recommend our attempting at once to consider the desirability of creating a notice-of-alibi procedure and to pass objectively on the constitutionality of any such procedure which might result. It is one thing for a court to prescribe judicial procedures *necessary* to protect some fundamental constitutional principle or to effectuate some specific constitutional guarantee of individual liberty. [Citations.] It is quite another thing for a court to design judicial procedures which are in no way required by higher law but which may seem to some socially desirable and perhaps may be *permitted*—at least to some extent—by our state and federal Constitutions. In the former instance, constitutional principles guide the court's hand; in the latter instance constitutional principles may well have to stay the court's hand. Given the difficulty of the constitutional questions posed by [such] procedures, it is far better for this court to pass judgment, if and when necessary, on an integrated legislative document than on our own conditional decree by which we might seek to smooth the constitutionally rough edges of the order of the court below." (*Id.,* at pp. 845-846.) (Italics in original.)

In *People* v. *Collie, supra,* 30 Cal.3d 43, our Supreme Court, reaffirming *Reynolds* as "a model of judicial restraint" (*id.,* at p. 51), stressed that a court was "not the proper body to create procedural rules that tend to im-

pinge on the traditional and arguably constitutional rights of a criminal defendant" and therefore "disapprove[d] of any compelled production of defense evidence absent explicit legislative authorization" (*id.*, at p. 48).

As Justice Mosk aptly reasoned in *Collie* (30 Cal.3d at p. 56): "Firmly embedded in our law is the doctrine that the courts are the final interpreters and guardians of the Constitution. As the heirs of that institutional obligation, we must be reluctant to step out of our traditional role by undertaking to define in the first instance procedures that upon reflection may appear to undermine the foundational principles it is our primary responsibility to protect.

"We can do justice neither to the legitimate needs of the prosecution nor to the rights of the defendant in this context if we undertake judicial rule-making in an attempt to accommodate both ends simultaneously. Any effort to further the truth-seeking function bears considerable risk of encroaching on constitutional and other protections: as we have noted, the problem is complicated by an interrelated composite of state and federal constitutional concerns, statutory rules and common law privileges. We realize the same problems would confront the Legislature if it were to consider the issue, and we have grave doubts that a valid discovery rule affecting criminal defendants can be devised. But if the Legislature undertakes to formulate a comprehensive solution that purports to be practical in application and consistent with the public interest, any legislative error would be subject to judicial review. Ours is likely to be the last word on the subject; for that reason, it should not also be the first. As *Reynolds* observed, the most appropriate course of action is to refrain from acting in the absence of word from the Legislature. . . . [Fn. omitted.]"

The issue of allowing the complaining witnesses to testify via closed-circuit television from a separate room, instead of being examined in the courtroom, is no less constitutionally questionable than were the discovery issues our Supreme Court declined to resolve in *Reynolds* and *Collie.* Although, as a lower appellate court, we do not share the final authority of the Supreme Court, our responsibility for protecting constitutional rights is no less essential to our judicial role. (*People* v. *Collie, supra,* 30 Cal.3d at pp. 56-57, fn. 8.) We dare not forget Justice Frankfurter's warning that the history of procedure is "the history of American freedom." (*In re Gault* (1967) 387 U.S. 1, 21 [18 L.Ed.2d 527, 542, 87 S.Ct. 1428].) The closed-circuit television order herein raises significant and complex federal and state constitutional issues, potentially affecting petitioner's fundamental

rights to a public trial, confrontation of witnesses against him[2] and due process. (See Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases* (1978) 91 Harv.L.Rev. 567, 578; Note, *The Criminal Videotape Trial: Serious Constitutional Questions* (1976) 55 Ore. L.Rev. 567, 568-574; Libai, *The Protection of the Child Victim of a Sexual Offense in the Criminal Justice System* (1969) 15 Wayne L.Rev. 977, 1003-1005.)

Moreover, there are serious questions about the effects on the jury of using closed-circuit television to present the testimony of an absent witness since the camera becomes the juror's eyes, selecting and commenting upon what is seen. First, there may be significant differences between testimony by closed-circuit television and testimony face-to-face with the jury because of distortion and exclusion of evidence. (See *Stores* v. *State, supra,* 625 P.2d at pp. 828-829; Note, *The Criminal Videotape Trial: Serious Constitutional Questions, supra,* at pp. 574-576.) For example, "the lens or camera angle chosen can make a witness look small and weak or large and strong. Lighting can alter demeanor in a number of ways, . . ." (*Id.,* at p. 575.) "Variations in lens or angle, may result in failure to convey subtle nuances, including changes in witness demeanor . . . ." (*Id.,* at p. 576.) "[A]nd off-camera evidence is necessarily excluded while the focus is on another part of the body. . . ." (*Id.,* at p. 577.) Thus, such use of closed-circuit television may affect the jurors' impressions of the witness' demeanor and credibility. (*Ibid.*; cf. Miller & Fontes, *Real Versus Reel: What's the Verdict? The Effects of Videotaped Court Materials on Juror Response,* Final Report, NSF-RANN GRANT APR75-15815, (Unpub. Monograph 1975) Dept. of Communication, Michigan State U., pp. 235-238.) Also, it is quite conceivable that the credibility of a witness whose testimony is presented via closed-circuit television may be enhanced by the phenomenon called status-conferral; it is recognized that the media bestows prestige and enhances the authority of an individual by legitimizing his status. (See Miller and Fontes, *Real Versus Reel: What's the Verdict? The Effects of Videotaped Court Materials on Juror Response, supra,* pp. 74-75.) Such

---

[2]It would appear from a careful reading of the cases that *physical* confrontation is an element of Sixth Amendment guarantees. (See, e. g., *Herbert* v. *Superior Court* (1981) 117 Cal.App.3d 661, 667 [172 Cal.Rptr. 850, 19 A.L.R.4th 1276]; *Mattox* v. *United States* (1895) 156 U.S. 237, 242-243 [39 L.Ed. 409, 410-411, 15 S.Ct. 337]; *United States* v. *Benfield, supra,* 593 F.2d at p. 819; *Stores* v. *State* (Alaska 1980) 625 P.2d 820.)

For example, the *Mattox* court stated: "[T]he primary object of the [Confrontation Clause] . . . was to prevent depositions or *ex parte* affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that *they may look at him, and judge by his demeanor upon the stand* and the manner in which he gives his testimony whether he is worthy of belief." (156 U.S. at pp. 242-243 [39 L.Ed. at p. 411]; italics added.)

considerations are of particular importance when, as here, the demeanor and credibility of the witness are crucial to the state's case.

Second, the presentation of a witness' testimony via closed-circuit television may affect the presumption of innocence by creating prejudice in the minds of the jurors towards the defendant similar to that created by the use of physical restraints on a defendant in the jury's presence. (See, e. g., *People* v. *Duran* (1976) 16 Cal.3d 282, 289-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].)

The mere presence and gravity of these significant questions and concerns render it inappropriate to create by ad hoc judicial fiat such a drastic departure from established procedures.[3] We are satisfied that such a radical innovation is not within the proper framework of rulemaking contemplated under the trial court's inherent powers.

We need not reach the substantial constitutional questions raised by the terms and scope of the order. Where, as here, the case can be decided on the narrower grounds of the lack of the necessary explicit statutory authorization for such a drastic deviation from settled procedures, we find this the more prudent course. It is not our function as an appellate court to give an advisory opinion on constitutional issues. Our Supreme Court has consistently refused to decide constitutional questions unless they are absolutely necessary for disposition of the case. (See, e.g., *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000]; *People* v. *Green* (1980) 27 Cal.3d 1, 50 [164 Cal.Rptr. 1, 609 P.2d 468].)

Moreover, our unwillingness to reach the constitutionality of a closed-circuit procedure at trial, in the absence of statutory enabling legislation, is reinforced by the fact that there is not even an order from the court describing with particularity the actual arrangements. The generalized minute order of the court contains no details whatsoever.[4]

According to the parties, the physical layout will include the following: Each of the two minors to be called as a prosecution witness will testify separately in a small anteroom (probably the jury room) with the only other persons present in that room being a parent, as a supporting adult, and the court bailiff. The judge, jury, defendant, both counsel, the court clerk, court reporter and the public (including the press) will be in a separate courtroom. Both the courtroom and anteroom will have television cameras and three

---

[3]Television coverage of courtroom proceedings is now permitted under certain guidelines. (See Cal. Rules of Court, rule 980.2.)

[4]Both parties apparently agree that procedures will generally be modeled after that used in the preliminary examination in the Los Angeles Municipal Court in the case of People v. Greenup, No. A 752034.

television monitors for viewing. The three television screens in the courtroom will face the judge, the well in front of counsel table, and the jury box. The three screens in the anteroom will show the defendant, the trial judge and the attorney who is examining the witness. Apparently a single image of the testifying minor and supporting parent will be televised. The voices of those in the anteroom will simultaneously be transmitted as the examination is conducted.

However, even if we assume, without any order of the court, that the court will in fact follow these procedures, there are additional disputed factual allegations which may be relevant to a discussion of the constitutionality of the closed-circuit procedure.[5] Accordingly, it would be premature to reach the constitutional issues in the abstract.

II

*Lack of Statutory Power*

The People contend that Evidence Code section 765 and Penal Code section 288, subdivision (c) provide the requisite statutory authority for closed-circuit television. We disagree.

A. *Evidence Code Section 765*

■■■ Evidence Code section 765 provides that "[t]he court shall exercise reasonable control over the mode of interrogation of a witness so as (a) to make such interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and (b) to protect the witness from undue harassment or embarrassment."

■■■ It is an axiom of statutory construction that legislative enactments should not be presumed to overthrow long-established principles of law unless such an intention is made clearly to appear either by express declaration or by necessary implication. (*People v. Cardenas* (1982) 31 Cal.3d 897, 914 [184 Cal.Rptr. 165, 647 P.2d 569]; *People v. Blackwell* (1981) 117 Cal.App.3d 372, 377 [172 Cal.Rptr. 636].) ■■■ There is nothing in the general language of this statute or in its history that warrants a presumption that it was meant to empower a court to order that the complaining

---

[5]For example, the following allegations by the People have not been ascertained: the anteroom screen showing the defendant will also show defense counsel and a segment of the audience seated behind them in the courtroom; the courtroom screen facing counsel table will be visible to spectators seated in the audience; the victim will be informed before testifying that his testimony will be simultaneously televised into the courtroom for viewing by judge, jury, defendant, counsel and public; and the judge will instruct the parent present with the minor in the anteroom not to touch or talk to the minor during his testimony unless he needs comforting.

victims testify at trial via closed-circuit television from a room separate from the court, defendant and jury despite the long-standing requirement of requiring physical presence.

■ ■ ■■ As the Law Revision Commission comment to Evidence Code section 765 points out, this section restates the substance of and supersedes section 2044 of the Code of Civil Procedure.[6] The language in the repealed statute which it recodified provided that "[t]he Court must exercise a reasonable control over the mode of interrogation, so as to make it as rapid, as distinct, as little annoying to the witness, and as effective for the extraction of the truth, as may be; but subject to this rule, the parties may put such pertinent and legal questions as they see fit." (7 Cal. Law Revision Com. Rep. (1965) p. 354.) It is evident from the former language that the power conferred upon trial judges to control the mode of interrogation essentially referred to the type and form of questioning of a witness, not the witness' presence or absence in the courtroom.

The Law Revision Commission comment further describes section 765 as continuing in effect "the latitude permitted the judge in controlling the examination of witnesses under existing law." As examples of such latitude, the comment cites *Commercial U. A. Co.* v. *Pacific G. & E. Co.* (1934) 220 Cal. 515 [31 P.2d 793], and *People* v. *Davis* (1907) 6 Cal.App. 229 [91 P. 810]. In *Commercial,* where the appellant complained of the court's rulings on the questioning of witnesses, our Supreme Court stated: "A trial judge is not to be unduly and unreasonably hampered and restricted in the exercise of control over the proper examination of witnesses and the conduct of the trial generally. Considerable latitude is, and must be, accorded to him in this regard." (220 Cal. at p. 525.)

But this "considerable latitude" does not confer authority to overturn well-settled procedures of constitutional dimension by having witnesses testify outside the courtroom. Rather, it must be exercised in the context of the questioning of witnesses within the courtroom. For example, in *People* v. *Davis, supra,* 6 Cal.App. 229, it was pointed out that the court did not err in directing the prosecuting witness to testify in a narrative fashion about defendant's statements to her a few minutes before the offense.

B. *Penal Code Section 288, Subdivision (c)*

■ The People's claim that Penal Code section 288, subdivision (c) expressly mandates the closed-circuit procedure also lacks merit. Whereas subdivisions (a) and (b) of section 288 define and fix punishment for lewd

---

[6]The commission's comments "are declarative of the intent not only of the draftsmen of the code but also of the legislators who subsequently enacted it." (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 158, fn. 4 [98 Cal.Rptr. 649, 491 P.2d 1].)

conduct with a minor, subdivision (c) provides as follows: "In any arrest or prosecution under this section the peace officer, the district attorney, and the court shall consider the needs of the child victim and shall do whatever is necessary and constitutionally permissible to prevent psychological harm to the child victim."[7]

Subdivision (c) was adopted by the Legislature in 1981. There have been no reported decisions so far construing its intent aside from the comment in *People* v. *Hetherington* (1984) 154 Cal.App.3d 1132, 1140 [201 Cal.Rptr. 756], that "[b]y adding subdivision (c) to section 288 in 1981 . . . the Legislature recognized *both* subdivisions (a) and (b) violations often cause irreparable psychological and emotional damage to child victims."

Subdivision (c) was added to section 288 as part of Senate Bill No. 586. The Legislative Council Digest is silent on the purpose of this section. The source of this legislation was the Joint Committee for Revision of the Penal Code. (See Summary of 1981 Crime Legislation [1981 Gen. Sess.], p. 17.)[8]

On December 16, 1980, April 10, 1981, and April 24, 1981, the Joint Committee for Revision of the Penal Code held extensive investigatory hearings on the problem of child molestation in California. We refer to the record of these hearings not to ascertain the actual legislative intent but rather, merely as an aid to "placing a reasonable construction on the statute." (*People* v. *Cicero* (1984) 157 Cal.App.3d 465, 481 [204 Cal.Rptr. 582].) Our examination of the record of these proceedings does not disclose any reference to the use of closed-circuit television in the presentation of testimony at trial by a minor witness. (See Joint Committee for Revision of the Penal Code, Hearing on Child Molestation, on Dec. 16, 1980, and

---

[7]Section 288, subdivisions (a) and (b) provide as follows: "(a) Any person who shall willfully and lewdly commit any lewd or lascivious act including any of the acts constituting other crimes provided for in Part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such child, shall be guilty of a felony and shall be imprisoned in the state prison for a term of three, six, or eight years.

"(b) Any person who commits an act described in subdivision (a) by use of force, violence, duress, menace, or threat of great bodily harm, shall be guilty of a felony and shall be imprisoned in the state prison for a term of three, six or eight years."

[8]The language of subdivision (c) was part of the original bill introduced on March 16, 1981, and remained in the bill until August 25, 1981, when the entire Senate version of the bill was struck during hearings before the Assembly Criminal Justice Committee. The language was placed back into Senate Bill No. 586 during conference committee and was contained in the chapter version of the bill (Stats. 1981, ch. 1064, § 1) which was signed by Governor Brown on September 30, 1981.

Hearings on Child Molestation Legislation on Apr. 10, 1981, and Apr. 24, 1981.)[9]

Moreover, the Summary of 1981 Crime Legislation Report compiled by the Joint Committee for Revision of the Penal Code merely states that "S.B. 586 mandates that in any prosecution for child molestation the needs of the child to be protected from further psychological harm during arrest and prosecution be placed on an equal priority with the successful prosecution of the offender." (Summary of 1981 Crime Legislation, *supra,* at p. 17.) We construe this language to mandate a philosophical change focusing on the minor's needs. But we cannot read into this statute a legislative mandate for a closed-circuit television procedure or, indeed, any other specific procedure, which so drastically affects the rights of a defendant.

We cannot imply from the broad, open-ended language in subdivision (c) that the Legislature intended such a fundamental change in our organic law which would abrogate traditional statutory rights to the presence of the testifying witness in the courtroom with the defendant. (See, for example, Evid. Code, § 711; Pen. Code, § 686, subd. 3.) Indeed, were we to read subdivision (c) as literally and broadly as the People urge, it would authorize wholesale revision in the entire procedural format of a criminal trial, especially since every sex crime against a minor under age 14 can be charged as a Penal Code section 288 violation.

The flurry of legislative activity after the passage of subdivision (c) argues against such a broad interpretation of the statute. For example, section 868.5, which provides for a minor alleged victim of a sex offense to have a supporting person in attendance, was specifically amended in 1983, two years after the passage of subdivision (c) of section 288, to include cases involving section 288 and to provide that the supporting person can remain in attendance even if he is a witness. Similarly, the recently signed Senate Bill No. 1899 (Stats. 1984, ch. 1423) amends Evidence Code section 767 to permit leading questions to a child under 10 years of age in a case involving a prosecution under Penal Code section 288. There would be no reason to pass such legislation if subdivision (c) already provided such remedies.

█ As we have previously noted, legislative enactments should not be · construed to overthrow long-established principles of law unless such an

---

[9]Testimony was presented by a number of witnesses questioning the sensitivity of the criminal justice system to the special needs of children who are victimized by sexual abuse. Besides advocating more considerate treatment of such children by police, prosecutor and courts, witnesses at the hearing recommended, among other things, videotaping procedures to avoid victims having to repeat their testimony, strictly prohibiting continuances, closing hearings, providing for the attendance of a supporting parent, and limiting the kind of questioning and voir dire. But we have found no references to authorizing closed-circuit television to avoid the youth testifying in the presence of the defendant during court proceedings. Indeed, there is no evidence that the joint committee ever discussed this particular procedure.

intention is clearly shown by express declaration or necessary implication. (*People* v. *Blackwell, supra,* 117 Cal.App.3d at p. 377.) ■ Moreover, where, as here, language reasonably susceptible of more than one construction is used in a penal law, the construction which is more favorable to the defendant should be adopted. The defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute. (*People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186].)

### III

#### *Insufficient Showing to Support Use of Closed-circuit Television*

■ Furthermore, even assuming arguendo that subdivision (c) permits the use of closed-circuit television, the issue arises as to whether the record in the instant case supports the invocation of this procedure. In order to properly define the problem, we will first examine two significant parts of the problem.

Although the right of confrontation is of constitutional stature, it is not absolute. (*Herbert* v. *Superior Court, supra,* 117 Cal.App.3d at pp. 667-668.) Courts have drawn several narrow exceptions from the general rule that an accused has the right to confront the witnesses against him. (*Ibid.*) For example, "[a]part from the hearsay exceptions which can apply to obviate confrontation at trial [citation] a defendant may waive the right by disruptive conduct in the courtroom. [Citations.] . . . 'The accused also waives his right of confrontation by entering a guilty plea. [Citations.]'" (*Ibid.*) The use of closed-circuit television to present the testimony of the state's principal witnesses *may* implicate the defendant's right of confrontation. ■ To the extent that televised testimony represents a denial of the right of confrontation, it must be shown that the denial is necessitated by a compelling interest. (See *Globe Newspaper Co.* v. *Superior Court* (1982) 457 U.S. 596, 606-607 [73 L.Ed.2d 248, 256-257, 102 S.Ct. 2613]; *Ohio* v. *Roberts* (1980) 448 U.S. 56, 63-64 [65 L.Ed.2d 597, 605-606, 100 S.Ct. 2531].)

The state interest asserted here to support the use of televised testimony is the prevention of psychological harm to the child victim of sex crimes. Here, as in *Globe Newspaper Co.,* "[i]t is important to note that in the context of [subd. (c)], the measure of the State's interest lies not in the extent to which minor victims are injured by testifying, but rather in the incremental injury suffered by testifying *in the presence of the* [jury] *and the* [defendant]." (457 U.S. at p. 607, fn. 19 [73 L.Ed.2d at p. 258].) In our research of the professional literature on the matter, we have not discovered any study, based on empirical data, which deals with the damaging psychological effect of giving testimony in the presence of the jury and the

accused, on the sexually abused child. Rather, we found that such literature merely contains generalized statements to this effect. (See, e. g., Pynoss & Eth, *The Child as Witness to Homicide* (1984) 40 J. Soc. Issues, No. 2, 87, 96-97; Weiss & Berg, *Child Victims of Sexual Assault: Impact of Court Procedures* (1982) 21 J. Am. Acad. Child Psychiatry, No. 5, 513, 515; Reifen, *Court Procedures in Israel to Protect Child-Victims of Sexual Assaults* in 3 Victimology: A New Focus, Crimes, Victims and Justice (Drapkin & Viano, edits. 1974) ch. 6, pp. 67-68; Schultz, *The Child as a Sex Victim: Socio-Legal Perspectives,* in 4 Victimology: A New Focus, Violence and Its Victim (Drapkin & Viano, edits. 1974) ch. 12, pp. 184-185.)

Like *Globe Newspaper Co.,* we recognize that "safeguarding the physical and psychological well-being of a minor" is a compelling state interest. (457 U.S. at p. 607 [73 L.Ed.2d at p. 258].) Nevertheless, we conclude that, before a child victim is excused from testifying in the presence of the jury and the accused on the premise that he will suffer additional injury, the basis for such a premise must be established both in fact as well as in logic, and its dimensions must be spelled out in terms of its nature, degree and potential duration. The reason for this conclusion is that extreme care must be taken to strike the correct balance between the policies protecting the mental health of the child victim and the right of the accused to a fair trial.

Moreover, each case must be determined on its own facts. For example, in *Globe Newspaper Co.,* where the court was concerned with the exclusion of the press and public from a criminal case in order to protect a child victim, the United States Supreme Court stated: "A trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim. [Fn. omitted.]" (457 U.S. at p. 608 [73 L.Ed.2d at p. 258].) Furthermore, in connection with need for individual decisions, one commentator stated: "Psychiatric opinions and studies emphasize that each child victim reacts to an offense and its aftermath in his own individual way. A case of incest is different from indecent exposure, a stranger-aggressor different from an offender whom the child knows, use of force different from willing participation, etc. Thus, there can be no more justification for excusing all child victims from testifying than for imposing the duty on all of them. Each case merits its own individual decision." (Libai, *The Protection of the Child Victim of a Sexual Offense in the Criminal Justice System, supra,* at p. 1009.)

In addition, the burden of proof on the issue of invocation of televised testimony rests with the proponent of the procedure and the showing must be made by competent evidence. (See *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 516 [194 Cal.Rptr. 431, 668 P.2d 738].) We are satisfied that the parents' testimony in the instant case on the issue of their minor children's mental health is legally insufficient to support a finding that this

procedure is necessary. Thus, we conclude as *Stritzinger* did, in the analogous situation of unavailability of a witness under Evidence Code section 240[10] that either expert testimony on the witness' condition or the witness' own testimony is properly required. (*Id.,* at pp. 516-517.)

### Conclusion

The use of closed-circuit television for the main complaining witnesses in a criminal trial encompasses a drastic change in our system of jurisprudence. It, among other things, may impinge upon cross-examination, the very heart of the tools used for truth-finding and described by the United States Supreme Court in *California* v. *Green* (1970) 399 U.S. 149, 158 [26 L.Ed.2d 489, 497, 90 S.Ct. 1930], as the " 'greatest legal engine ever invented for the discovery of truth.' " (See *Herbert* v. *Superior Court, supra,* 117 Cal.App.3d at p. 667.) Such a major step should be taken, "if at all, only upon the considered judgment of the Legislature." (*Reynolds* v. *Superior Court, supra,* 12 Cal.3d at p. 837.)

Accordingly, we conclude that the trial court erred in ordering the use of closed-circuit television and issue a peremptory writ of prohibition restraining enforcement of that order.

Johnson, J., concurred.

**LILLIE, P. J.**—I concur in the result reached in the scholarly majority opinion on the facts of this case, but I respectfully disagree with the conclusion that the trial court does not have the power to permit closed-circuit testimony by a child victim in a proper case.

---

[10]We note that Evidence Code section 240 has just been amended, effective January 1, 1985 (Assem. Bill No. 3840 [1983-1984 Reg. Sess.] Stats. 1984, ch. 401), with regard to the definition of "unavailability of a witness" by the addition of subdivision (c). That subdivision includes instances in which expert testimony "may constitute a sufficient showing" to "establish[] that physical or mental trauma resulting from an alleged crime has caused harm to a witness of sufficient severity that the witness is . . . unable to testify without suffering substantial trauma . . . ." An expert within this section is defined as a physician, surgeon, psychiatrist, licensed psychologist, licensed clinical social worker, or licensed marriage, family or child counselor.

Under Penal Code section 1346, the People may obtain permission from the court to videotape the testimony of a child victim of 15 years or less given at a preliminary hearing where the defendant is charged with a violation of certain sex crimes, to wit, Penal Code sections 243.4, 261.5, 264.1, 285, 286, 288, 288a, or 289. Also, section 1346 provides: "If at the time of trial the court finds that further testimony would cause the victim emotional trauma so that the victim is medically unavailable or otherwise unavailable within the meaning of Section 240 of the Evidence Code, the court may admit the videotape of the victim's testimony at the preliminary hearing as former testimony under Section 1291 of the Evidence Code."

Penal Code section 288, subdivision (c) expressly mandates that in a prosecution under that section (§ 288, subds. (a) and (b)) the court "shall consider the needs of the child victim and shall do *whatever* is necessary and constitutionally permissible to prevent psychological harm to the child victim." (Italics added.) This is a broad grant of power to the court. Certainly closed-circuit testimony is not specifically mentioned, but I find nothing in the statute or in the Joint Committee's comments indicating that such procedure would be outside the scope of "whatever is necessary . . . to prevent psychological harm to the child victim." Instead, a common sense reading of the statute would seem to permit just such an accommodation to the fears and traumas of a child victim who would suffer psychological harm from testifying in open court.

The statute contains two limitations on the exercise of this power. First, the court is authorized to do whatever is *necessary* to prevent harm to the child. The determination of this need must be made on the facts of each particular case. I agree with the majority that the showing in this case, consisting only of the testimony of the parents on the issue of the mental health of their minor children, is insufficient to support a finding that a closed-circuit procedure is necessary to prevent harm to these children. The second limitation is that the court may only do what is *constitutionally permissible* to prevent psychological harm to the child. The majority notes the constitutional questions which may arise from the use of closed-circuit testimony in a criminal case. The court must exercise its power under section 288, subdivision (c) with care and precision in order to protect the constitutional rights of the defendant. The record before us does not reflect the requisite attention to these constitutional concerns. A bare minute order permitting closed-circuit testimony without provision for the precise manner in which it shall be given does not provide the necessary protection of the defendant's constitutional rights and is therefore not a proper exercise of the court's authority under section 288, subdivision (c).

A petition for a rehearing was denied December 7, 1984, and the opinion was modified to read as printed above. The petition of real party in interest for a hearing by the Supreme Court was denied February 14, 1985. Lucas, J., was of the opinion that the petition should be granted.