Filed 12/8/14  P. v. Davis CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050244 |
| v. | (Super. Ct. No. FMB004179) |
| CARRIE LEE DAVIS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Katrina West, Judge.  Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

Carrie Lee Davis (Carrie) appeals from a judgment after the trial court concluded she had not established her sanity had been restored. Carrie argues insufficient evidence supports the trial court's conclusion she should not be unconditionally discharged. We disagree and affirm the judgment.

FACTS

In 2000, Carrie was found not guilty by reason of insanity to one count of second degree murder, two counts of child abuse, two counts of torture, two counts of false imprisonment, and one count of incest. In 2002, Carrie was admitted to Patton State Hospital (Patton). In 2011, Carrie was released from Patton and placed in a Statewide Transitional Residential Program. Later that year, Carrie was transferred to the San Bernadino/Riverside County Conditional Release Program (CONREP).

In February 2012, Carrie filed a petition for an order for the restoration of her sanity under Penal Code section 1026.2 (all further statutory references are to the Penal Code). The parties waived their right to a jury trial. Before trial, the court indicated it had read and considered CONREP's section 1026.2 summary report, dated August 28, 2012, which was prepared by Brandi Dyer, a clinical therapist, and a confidential psychological assessment report, dated August 16, 2012, prepared by Dr. Suzanne O'Brien, a clinical psychologist.

The bench trial began in September 2012. Carrie provided the following testimony about her background and the events that landed her in custody. Carrie's struggles began at the age of 14 when she started using drugs. At the age of 20, Carrie became pregnant and married the father, Bob Barnett. Carrie, Barnett, and their daughter, C.F., moved to Florida. While living in Florida, Barnett and Carrie invited their friends John Davis (John), his girlfriend Faye Potts, and their daughter to visit them. After visiting Florida, John decided to return to California. Carrie asked John if she and C.F. could join them because Barnett was drinking heavily and performing poorly at his job. Before leaving for California, John and Carrie began a brief romantic relationship.

2

Once Carrie, C.F., John, Potts, and Potts's daughter got to California, Carrie and John began having a sexual relationship. Carrie did not look for a job because John did not want her working outside the home. After Carrie became pregnant with the first of three sons with John (Y.D., R.D., and A.D.), she became afraid of John. John told Carrie he wanted to raise their sons according to the principles of the Bible and Native American culture.

John would often preach to Carrie like he was a spiritual leader. John chose "Lord" for his last name and told Carrie that in the biblical times, wives would call their husbands "Lord." John changed his name to Rajohn Lord. John began to beat their children once they turned two or three years old. John would use "rod[s] of correction," which were wooden or fiberglass boards wrapped in duct tape, to beat the kids.

One day, Carrie went to check on the children and noticed R.D.'s lips were blue. She picked up R.D., noticed he was not breathing, and began bouncing him to make him breathe. Carrie rushed R.D. to John, and John tried doing CPR to revive R.D., but he was unsuccessful. Carrie and John did not call an ambulance or take R.D. to a hospital. John lived an "old-time Indian way of life" and did not believe in the practice of medicine. Carrie did not think a hospital or an ambulance would have saved R.D. because they lived so far from a medical facility.

John burned R.D.'s body outside their house. Carrie did not agree with this, but she did not stop John because she trusted him. John brought the body inside and burned it again in the fireplace. John took R.D.'s remains to a well where he crushed the bones. Carrie was afraid of John and did not think she had the freedom to talk with him about the situation. John disposed of all the photographs of R.D. Carrie continued to live with John because she knew how it felt to grow up in a home without both parents and did not want that for her children.

Carrie and John never reported the births of any of their children to public officials. John wanted to live like Native Americans and have nothing to do with modern

3

society.  The children were home schooled and had never been outside the complex where they lived.

On many occasions, John would bind the children to the bed and untie them only to use the restroom.  On one occasion, Carrie walked out of the bathroom to witness John raping C.F.  On another occasion, John told Carrie to simulate sex with Y.D. to teach him sex positions.  John wanted to teach Y.D. "how to interact with a woman." John told them to simulate "doggie style" so Y.D. got behind Carrie and held her around her waist, but he did not rub his groin against her or otherwise touch her.  John also made them imitate a few more sex positions, and Carrie complied because she was afraid of John.

Carrie testified, stating she was ready to be released from supervision.  She stated she wants the freedom to get a job, take classes, and move forward with her life. She also testified she has not experienced any hallucinations or delusions in the past year. Carrie does not believe she suffers from any mental disorders even though she acknowledged she was diagnosed with Shared Psychotic Disorder in 2002.  Carrie admitted she had a dependent personality and depended on John to make decisions for her.

Carrie called three people to testify on her behalf:  her father William Widener (William), her brother Martin Widener (Martin), and her daughter C.F.  William testified he had been in constant contact with Carrie for the past five years, including visiting her in person two or three times.  He stated she seemed eager to learn a healthy lifestyle and would talk to him without yelling or getting angry.  William stated he would provide food, a place to live, and employment leads for Carrie if she were released.

Martin testified that over the past five years, he spoke to Carrie on the telephone once a day and visited her about 30 times.  He also testified that during their conversations, Carrie never yelled, became angry, or engaged in dangerous behavior. Martin did not believe Carrie suffers from any mental disorders.  However, Carrie told

4

him she has something similar to posttraumatic stress disorder. He stated that if Carrie was to be released, she could live with him and he would help her with a job search. He lives with a 74-year-old second cousin.

C.F. testified she was in constant contact with Carrie, both over the telephone and visiting her in person once or twice a month. C.F. also testified Carrie did not become angry or yell during their conversations. She also testified about the day R.D. passed away, remembering Carrie was crying and kissing R.D. C.F. testified John molested her on multiple occasions. C.F. stated she did not want to have sexual intercourse with John, but he forced her. She also stated Carrie knew John was molesting her, but she did not stop it. The molestations happened again a few years later when Carrie was not around, and C.F. did not tell Carrie what happened. C.F. repeatedly asked Carrie why she pled guilty to the charges when John forced her to do many of the things she was charged with. C.F. also testified she could provide food and housing for six months to one year if Carrie was released. C.F. takes care of her brother's two children as well as her own daughter.

The prosecution offered three expert witnesses to testify: O'Brien, Alicia Harris-Deaver, and Dyer.

O'Brien interviewed and evaluated Carrie. O'Brien diagnosed Carrie with Shared Psychotic Disorder in remission. The disorder involves two people, a primary partner and a secondary partner. The primary partner—John in this case—has developed psychotic symptoms, hallucinations, and delusions. The secondary partner—Carrie in this instance—is a passive and dependent person who then takes on those hallucinations or delusions. This behavior will typically occur in isolated environments where there is little contact with the outside world. When the two partners are separated, the secondary partner's condition will usually resolve itself. O'Brien testified Carrie believed John was Lord Jesus Christ because that is what he told her and she was afraid to say otherwise.

John would always do the errands, so Carrie never left the house or had any contact with society. She also stated Carrie had a history of abusing drugs.

O'Brien also diagnosed Carrie with Dependent Personality Disorder (DPD) on Access II, which is a lifelong issue, rooted in an isolated childhood. Carrie lived with her grandparents much of her childhood, and they were extremely controlling and isolated her from the community. Carrie's parents neglected her, and she wanted to comply with her grandparents' extreme rules, so she did everything they asked in order to be "accepted." A person with this disorder seeks an attachment figure who seems capable and strong. Because of her childhood, Carrie's "normal" was having strict limitations and being isolated. Typically, a person will set aside the needs of everybody, including themselves, in order to satisfy the needs of the dominant figure. The person can have a naïve view of reality in order to maintain the image of the dominant person. A person with DPD internalizes their feelings so one would not necessarily see threatening behavior or yelling. A person with DPD is willing to take abuse, agree with things they disagree with, and do what they need to do to maintain a connection with their supporter. This personality disorder is essentially lifelong. A person "can work to control the symptoms if they are aware of it," but these traits are so entrenched in one's personality they never go away. O'Brien testified Carrie does not have a good grasp on her DPD and strives to seek approval and be cared for. Carrie's tests showed she was in denial. She said Carrie could get overwhelmed in the future and get into another relationship where she would either be abused or let others be abused without stopping it.

O'Brien testified Carrie admitted she reenacted sex positions with Y.D., but she did not think it was abuse. Carrie also did not take responsibility for the inappropriate behavior and blamed it on John. She did not understand her failure to intervene was abuse.

O'Brien testified about the deficiencies in Carrie's relapse prevention plan. Carrie had a few places she could stay if released, "but there was no permanent type of

6

housing." Carrie was unable to explain how she would support herself. She also has not worked in about 30 years and O'Brien was concerned with Carrie's ability to find a job to support herself.

O'Brien was concerned Carrie is at risk of repeating her past behaviors, in part because she would have to rely on other people for her care and support, and she is naïve or has "magical thinking." She stated Carrie is aware of her disorder, but does not see it in her day-to-day actions and does not see the symptoms when they surface so she can catch it. Carrie would be at risk of repeating her behaviors whether she was around children or elderly people.

Harris-Deaver, a clinical therapist, testified about Carrie's participation in group meetings. She stated Carrie would not talk about the crimes she committed. Rather, Carrie preferred to discuss superficial things, such as taking care of her dog or her volunteer work. Harris-Deaver stated Carrie does not have an adequate understanding of her criminal behavior, her responsibility for the crimes, how her mental illnesses contributed to her criminal behavior, her risk factors, and her potential risk triggers for future dangerous behavior. She also believes Carrie does not have an adequate prevention plan. Since Carrie does not discuss her criminal behavior, it shows she lacks the awareness of how to not engage in that behavior in the future. Carrie has not been able to demonstrate she understands her DPD fully and how it can lead her to criminal behavior. Harris-Deaver stated that understanding and comprehending this information is crucial to improve.

Dyer testified about Carrie's time at CONREP. Dyer testified Carrie was still a danger to society because of her DPD. Since Carrie had not had a relationship in a long time and had not been able to demonstrate she had the skills to be in a positive relationship without issues, she is at risk of repeating past behavior. Dyer stated she preferred Carrie to stay in a program so she can get help to manage her independence. Carrie also will not admit to engaging in incest and it is a difficult subject for her to

7

confront. Carrie denies she actually committed incest, and will only state that she mimicked sexual positions with her son. Dyer believes Carrie does not understand how difficult it will be to live outside of CONREP.

The trial court found Carrie had not met her burden of proof showing her sanity had been restored and she was not a danger to others. The court found O'Brien's testimony to be particularly convincing and Carrie's testimony to be lacking and demonstrating she had a great deal more work to do. The court stated Carrie's reluctance to discuss the crimes and her minimization of her involvement in the crimes shows her mental illness still exists. The court also found important the fact Carrie had not had a meaningful relationship while in CONREP. The court commended Carrie on her progress but concluded she needed to improve further before she could be released without supervision.

DISCUSSION

When a defendant is found to have been insane at the time of committing an offense, the trial court shall commit the defendant to a state hospital or other appropriate public or private facility for the care and treatment of the mentally disordered, or place the defendant on outpatient status. (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1432-1434 (*Dobson*).) "A successful insanity plea relieves the defendant of all criminal responsibility. [Citation.]" (*Id.* at p. 1432.) The defendant will be committed to a state hospital "'in lieu of criminal punishment and is for the purpose of treatment, not punishment. [Citation.]' [Citation.]" (*Ibid.*) The two reasons to admit an insane person is "'to treat her mental illness and to protect her and society from her potential dangerousness. [Citation.]' [Citation.]" (*Ibid.*)

A defendant found not guilty by reason of insanity may thereafter be released from the state hospital upon the occurrence of one of the three events: (1) the restoration of sanity pursuant to section 1026.2; (2) expiration of the maximum term of commitment, which means the longest term of imprisonment which could have been

8

imposed for the offenses of which the person was convicted; or (3) approval of outpatient status.  (*Dobson, supra,* 161 Cal.App.4th at p. 1432.)

A petition for restoration of sanity under section 1026.2 involves a two-step process.  (*Dobson, supra,* 161 Cal.App.4th at p. 1432.)  "The first step requires the person to apply for release to the superior court of the county from which the commitment was made.  (§ 1026.2, subd. (a).)"  (*Dobson, supra,* 161 Cal.App.4th at p. 1432.)  "Once the application is filed, the court must conduct a hearing, commonly called the outpatient placement hearing.  (§ 1026.2, subd. (a) . . . .)"  (*Dobson, supra,* 161 Cal.App.4th at p. 1432.)  At the outpatient placement hearing the applicant must demonstrate by a preponderance of the evidence that he or she will not present a danger to others "'due to mental defect, disease, or disorder, *while under supervision and treatment in the community*.'  [Citations.]"  (*Ibid.*; § 1026.2, subd. (e).)  "The second step in the section 1026.2 release process is referred to as the restoration of sanity trial, and can only be reached if the applicant has already met the threshold test for placement in 'an appropriate forensic conditional release program.'  (§ 1026.2, subd. (e) . . . .)"  (*Dobson, supra,* 161 Cal.App.4th at p. 1433.)

When reviewing the trial court's determination, an appellate court will review whether the trial court abused its "discretion, drawing every reasonable inference in favor of the trial court's determination.  [Citations.]"  (*Dobson, supra,* 161 Cal.App.4th at p. 1434.)  A trial court has not abused its discretion when the present facts merely afford an opportunity for a difference of opinion.  An appellate court is not authorized to substitute its judgment for that of the trial court.  (*Ibid.*)

The sole issue on appeal is whether the trial court abused its discretion in concluding Carrie's sanity had not been restored and she should not be released from supervision.  Carrie argues the court erred because she met her burden of establishing she is not a danger to others.  We disagree.

The trial court properly concluded Carrie's sanity had not been restored because she had not demonstrated by a preponderance of the evidence she was not a danger to others. With regards to whether such dangerousness exists, mental health experts will often be the only way to establish whether or not the dangerousness still exists. (*People v. Lowe* (2012) 211 Cal.App.4th 678, 684-685 [expert prediction only evidence available of future dangerousness]; *People v. Bennett* (1982) 131 Cal.App.3d 488, 497 ["testimony by mental health experts in [§ 1026.5] context will often be the only way to establish whether such dangerousness exists"].)

Here, Carrie did not offer the testimony of any mental health experts to opine her sanity had been restored, she is not a danger, and she should be released. The only witnesses Carrie called to testify were family members who stated she would not get angry or yell during their visits and telephone conversations. A lack of anger and yelling is not convincing evidence to show Carrie had regained her sanity and did not pose a danger to others. Additionally, Carrie did not establish she was fully aware of her illness or how to stop similar behavior in the future.

Instead, the overwhelming majority of the evidence established Carrie had not regained her sanity. The prosecution offered three mental health experts who all testified Carrie was a danger to herself and others and should not be released. O'Brien testified that because Carrie did not understand her disorder and cannot prevent danger from happening in the future, she should not be released. O'Brien also testified Carrie did not take responsibility for her inappropriate behavior and blamed it on John. She further testified Carrie was aware of her disorder, but did not see it in her day-to-day actions and did not see the symptoms when they surface. A person with a mental illness needs to be able to understand their condition in order to successfully resolve it. (See *People v. Beeson* (2002) 99 Cal.App.4th 1393, 1399 [person with mental disorder must, at minimum, acknowledge seriousness of their mental illness].)

After meeting and speaking with Carrie, all three mental health experts testified as to their personal opinions on Carrie's future if she was released. All three experts stated Carrie would be a danger and should not be released because of her lack of understanding of her illness. Carrie portrays their testimony as too speculative. But predictions of future dangerous behavior "may be rationally projected and the drawing of such an inference is properly within the expertise of a qualified mental health expert." (*People v. Mapp* (1983) 150 Cal.App.3d 346, 352.) Carrie has not offered any mental health expert testimony to support her argument or refute the expert opinions offered by the prosecution. Carrie has not demonstrated the trial court abused its discretion in concluding she had not regained her sanity. We affirm the judgment.

## DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

MOORE, J.

11