Filed 8/13/15  P. v. R.D. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060914 |
| v. | (Super.Ct.No. BLF10000057) |
| R.D., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Charles Everett Stafford, Jr., Judge.  Affirmed.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Martin E. Doyle, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant R.D. was found not guilty by reason of insanity (paranoid schizophrenia) of the offense of assault with force likely to result in great bodily injury, and committed to Patton State Hospital. Near the end of defendant's commitment period, the People filed a petition to extend defendant's mental health commitment for an additional two years. Defendant appeals the trial court's ruling granting the commitment extension. We affirm.

### FACTS AND PROCEDURAL HISTORY

Defendant has a long history of mental health problems, including diagnoses of paranoid schizophrenia and abuse of drugs and alcohol. Defendant was hospitalized twice, before the current offense, for paranoid schizophrenic behavior.

In March 2010, defendant was experiencing auditory hallucinations. Defendant heard the voice of a young girl in his head, saying that she was hungry. Defendant believed his father had killed her. Defendant also believed that his father was going to stab him. Frightened and angry, defendant got a gun that was in the house and shot his father in the chest. Defendant's father survived the attack.

As a result of these events, defendant was charged with one count of attempted murder (Pen. Code, §§ 664, 187) and assault with a semi-automatic firearm (Pen. Code, § 245, subd. (b)). The trial court ordered mental health evaluations of defendant, first under Evidence Code section 1017,[1] and then a few days later under Penal Code

---

[1] Evidence Code section 1017 provides generally that no psychotherapist-patient privilege applies when a psychotherapist is appointed by order of the court, unless the psychotherapist is appointed for the purpose of aiding defense counsel in determining

*[footnote continued on next page]*

2

section 1368, to determine defendant's competence to stand trial. Proceedings were reinstated a few months later, after the trial court considered two evaluations and determined that defendant was competent.

Defendant then entered pleas of not guilty, and not guilty by reason of insanity. The court appointed two doctors to examine defendant under Penal Code section 1026. Defendant waived a preliminary hearing and was held to answer.

Proceedings were again suspended from December 2010 to April 2011, because of doubts about defendant's mental competence to stand trial. The court relied on the evaluations under Penal Code section 1026 in finding defendant presently incompetent to stand trial, but later found he had been restored to competency.

After extensive negotiations, in August 2011, the People amended the information to allege a non-strike charge of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)), and all the other charges and enhancements were dismissed. Defendant entered a plea of not guilty by reason of insanity to the new charge and waived trial by jury. The court tried the matter, finding that defendant had committed the offense, but that he was not guilty by reason of insanity, based on the evaluations under Penal Code section 1026. The court committed defendant to Patton State Hospital for a period not to exceed four years. Defendant was awarded 541 days of credit against this commitment term.

---

*[footnote continued from previous page]*
whether to enter or withdraw a plea of not guilty by reason of insanity, or whether or not to present a defense based on mental condition.

In August 2013, the Department of Mental Health (the Department) asked the People to file a petition to extend the term of defendant's commitment, which the Department alleged was set to expire in March 2014. The People filed such a petition (Pen. Code, § 1026.5, subd. (b)) in October 2013. In February 2014, the Department obtained a more current evaluation of defendant's condition; on March 5, 2014, the Department sent a second letter asking for defendant's commitment term to be extended. On March 14, 2014, the People filed an updated petition to extend defendant's commitment. On March 21, 2014, the date defendant's commitment would have expired, the trial court heard the matter. Defendant waived a jury trial. After a bench trial, the court ordered defendant's commitment extended for two years, to March 20, 2016.

Defendant has appealed the ruling extending his commitment.

## ANALYSIS

### I. Contentions and Standard of Review

The governing statute is Penal Code section 1026.5, which sets forth the criteria for extending a defendant's commitment period. Defendant urges that the ruling must be reversed because the evidence was insufficient to show that defendant met the criteria for an extended commitment. Defendant further argues that the trial court used an improper standard or burden of proof, requiring him to show that he was not dangerous rather than requiring the People to affirmatively show that he was. Finally, defendant contends that he established the defense provided for in the statute: namely, that he presented a preponderance of the evidence to show that (1) he no longer posed a substantial risk of

4

danger because his condition was controlled by medication, and (2) he would continue to take the medication in an unsupervised environment (citing *People v. Bolden* (1990) 217 Cal.App.3d 1591).

Penal Code section 1026.5, subdivision (b)(1), identifies the requisite elements: The person for whom an extension of commitment is sought must (1) be a person who committed a felony act but was found not guilty by reason of insanity under Penal Code section 1026; (2) suffer from a mental disease, defect or disorder; and (3) represent a substantial danger of physical harm to others as a result of a mental disease, defect or disorder. The third element, substantial danger of physical harm to others, has been interpreted to require "proof that a person under commitment has a mental disease, defect, or disorder that causes serious difficulty in controlling his or her dangerous behavior." (*People v. Bowers* (2006) 145 Cal.App.4th 870, 878.)

" ' " 'Whether a defendant "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others" under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony.' [Citation.] 'In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]' [Citation.]" [Citation.] A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an

extension of the defendant's commitment under section 1026.5. [Citation.]' [Citation.]"
(*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165.)

## II. Evidence Presented at the Hearing

### A. *Prosecution's Case*

Dr. Ilas, defendant's treating psychiatrist at Patton State Hospital, testified that defendant had been assigned to the unit Dr. Ilas was responsible for in 2012; Dr. Ilas had treated defendant for the past two years. On his admission to Patton State Hospital, defendant was diagnosed with two disorders: paranoid schizophrenia and polysubstance abuse. Defendant had a significant history of psychiatric admissions since 2003, several years before the crime. Defendant was paranoid and disorganized in his thinking. Near the time of the crime, defendant was disordered and paranoid, and he had not been sleeping. In the jail, he was observed removing his clothes and "talking gibberish." When defendant was admitted to Patton after the trial, defendant was paranoid, and he was experiencing sensory problems, such as hearing voices and feeling that he was possessed. At first, defendant was withdrawn and isolated, and did not communicate with the hospital staff or other patients.

Dr. Ilas had reviewed numerous documents, including evaluation reports prepared at the time of defendant's trial on the criminal charges. In one report, Dr. Jones related a history showing that defendant had been noncompliant in taking his antipsychotic medications for six months before defendant shot his father. Dr. Fitzgerald also

described defendant as noncompliant with his medications for months before the shooting incident.

Defendant had a significant history of alcohol and drug abuse. He started abusing alcohol at age 12 or 13, and continued to abuse alcohol until just prior to the shooting. Defendant began using marijuana when he was eight years old, and used heavily until he was at least 20 years old (defendant was 21 or 22 years old at the time of the commitment offense). Defendant used cocaine for about two months when he was 18 years old. He started using methamphetamine from age 15, and continued to use it heavily in the four or five months before the shooting.

Defendant's extensive history of behaviors, hospitalizations, treatment, and substance abuse justified current diagnoses of both schizophrenia and polysubstance abuse.

Dr. Ilas opined that defendant was likely to abuse drugs and alcohol if he were moved to a less restrictive setting. He based this opinion on defendant's progress in treatment; although defendant had completed an initial phase of treatment for alcohol and drug addiction in June 2013, defendant's attendance at the aftercare program declined significantly, to less than 50 percent. He also failed to attend Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings regularly.[2] In all of 2013, defendant had attended an average of only one AA or NA meeting per month.

---

[2] Defense counsel questioned Dr. Ilas about attendance cards maintained by each patient. Defendant's attendance card for AA and NA meetings purported to show consistency in his attendance at 12-step meetings, but the program director informed

*[footnote continued on next page]*

Then, in February 2014, just a few weeks before the extended commitment hearing, defendant was subject to a "serious incident report" when hospital staff found "pruno," the colloquial name for contraband inmate-made alcohol, in the room occupied by defendant and his roommate. Defendant's roommate was extremely intoxicated and was taken to the hospital. Plastic bottles containing pruno residue were found under defendant's bed. There were several deposits of vomit in the room, including on defendant's bed; in fact, defendant was found lying in the bed, covered in vomit, although it was disputed at the hearing whether the vomit was defendant's own, or it was from his roommate. Defendant appeared to be sedated. He refused to submit to blood or urine tests; the refusal was deemed a positive result. Defendant had also refused to provide samples for random drug screenings on two other occasions (June and September 2013) after completing his initial treatment program.

Based on defendant's history, his course of treatment, and his recent involvement with contraband alcohol, Dr. Ilas opined that defendant was in denial about his addictions. Dr. Ilas was not confident that defendant would follow his treatment protocol in an unstructured setting. If defendant abused illicit substances, and if he stopped taking his antipsychotic medications, the risk of becoming violent was increased.

---

*[footnote continued from previous page]*
Dr. Ilas that defendant had attended an average of only one meeting per month throughout 2013 and the first two months of 2014. The attendance cards are maintained by the patients themselves and may be subject to falsification.

The diagnosis of schizophrenia with paranoid delusions is a well-known risk for violent behavior. Defendant lacked insight into his inherent schizophrenia; he did not understand his illness or the importance of continued treatment. Dr. Ilas said, "That is why there are so many relapses and hospitalizations for schizophrenia."

Dr. Ilas found that defendant's diagnosed polysubstance abuse was not in remission. Defendant was at risk of relapsing into drug and alcohol use if he were released. The polysubstance abuse diagnosis contributed to defendant's dangerousness independently, and it compounded the risk of dangerousness in combination with his schizophrenia diagnosis. Defendant's underlying schizophrenia was not in remission. Some of his symptoms were in remission, such as auditory hallucinations and disorganized thoughts, because defendant had taken his medication every day in the hospital setting.

A patient like defendant would require secure treatment and close monitoring after discharge. The treatment team did not believe defendant's family would be able to provide these elements of support for defendant. Although defendant's family members (mother and father) had been supportive, in the sense of regular visitation during his hospitalization, their support had been insufficient in the past to prevent defendant's decompensation and dangerous behavior.

The People also presented the testimony of Dr. Matty, defendant's treating psychologist. Like Dr. Ilas, Dr. Matty had been treating defendant for two years, since his admission in 2012.

9

Dr. Matty testified that defendant's diagnoses were schizophrenia, paranoid type, and polysubstance dependency. Defendant had an early onset in the abuse of multiple intoxicating substances; Dr. Matty opined that the earlier substance abuse starts, the more difficult it can be to treat. Defendant's substance abuse was not in remission, based in part on his extensive history of abuse of drugs and alcohol, in part on defendant's poor record in treatment in the last six months, and also on the recent possession of pruno. Defendant was found in possession of fruit, one of several ingredients (e.g., fruit, bread, juice) hoarded by patients and then used collectively to manufacture pruno. Defendant's refusal to drug test was also significant; a drug screen would have exonerated defendant if he had not, in fact, consumed any pruno. Dr. Matty was of the view that defendant's abuse of drugs and alcohol was a dangerous behavior that defendant had difficulty controlling.

Defendant's release plan was too general and non-specific. Defendant's plan displayed no recognition of his individual triggers, no insight into recognizing his symptoms, or recognizing situations in which he was likely to decompensate. He had very little in the way of specific responses or coping mechanisms other than to visit the emergency room in a crisis, or to call his mother. Defendant had not identified in his treatment plan the particular stressors or other situations in which he might be tempted to use substances, and he had no plan of action in case of a relapse. Rather, defendant seemed to rely on a kind of denialist thinking, that what happened in the past will not happen again. Dr. Matty explained, "It's like getting in a car and saying you are never

10

going to have an accident. If you have had an accident before, as any insurance company will tell you, it raises your likelihood of having another accident." Defendant likely never intended to injure his father in the first place, "but yet it happened. [¶] So we have to acknowledge that fact and also acknowledge that despite every best intention that there is unfortunately a possibility that he could commit another violent act because of his mental illness in the future." The release plan should "prepare for the worst," but defendant was not doing so. Defendant was resistant to the notion that he could fall ill again in the future.

Dr. Matty was also not confident in the ability of defendant's family members to provide the structure he would need on his release. Dr. Matty based this opinion on defendant's demonstrated history; although he had been in his parents' care in the past, he had multiple hospitalizations for mental illness and, even though he was discharged with instructions to take antipsychotic medications, he was non-compliant with medication. Defendant's parents had proven ineffective at controlling his abuse of intoxicating substances. There was also a relationship between abusing illicit substances and the failure to take required antipsychotic medication. Dr. Matty testified that "Substance abuse makes it less likely because of things like impaired judgment and insight that come with using substances. It makes it less likely that someone will comply regularly with treatment. It makes treatment somewhat less effective."

11

Defendant's more recent poor track record (six months before the hearing) in participating in his treatment programs corresponded to a diminished interest in moving to a community outpatient program through the hospital and an increased interest in outright release through the court. When Dr. Matty admonished defendant that he needed to improve his attendance in treatment programs and 12-step meetings, as well as his compliance with urine and blood tests, defendant would promise to do better, but nothing changed. With respect to defendant's refusal to drug test in response to the pruno incident, defendant made the excuse that he was angry and he did not like needles. Dr. Matty testified that this response was concerning, "because it shows that he is willing to let anger and mood control some of his actions in the moment . . . ." Defendant's reaction "reduces my confidence in his ability to comply with those sorts of truths [*sic*] elsewhere."

B. *Defense Case*

Defendant was evaluated by a privately retained psychologist, Dr. Kania. Dr. Kania reviewed defendant's hospital records and interviewed defendant. During the interview, defendant's thinking was organized and logical. Defendant responded appropriately to questioning. Defendant gave his background of substance abuse and also told Dr. Kania what he remembered about the commitment offense.

Dr. Kania evaluated defendant for his ability to exercise impulse control. Defendant had been behaviorally compliant to the degree that he was allowed to have an inmate job in the information technology department. Defendant had not been in any

12

fights. Dr. Kania opined that, although defendant did have a severe mental illness, he was able to control any violent behavior and the illness was in remission.

Dr. Kania believed that the only disorder that was relevant to the petition for extension of defendant's commitment was the paranoid schizophrenia. That disorder was controlled with medication. Dr. Kania believed that defendant would be able to continue to take his antipsychotic medication without supervision. Even though, so far, defendant had only taken the medication in a structured hospital setting, Dr. Kania took into account that defendant had taken the medication for an extended period of time, two to three years, and that defendant had indicated that he felt the benefits of taking the medication. Defendant could function better, and thus saw the benefit of taking the medication.

Dr. Kania was aware of one incident in which defendant had become angry after asking at the nurse's station for more batteries and the request had been refused. Although defendant clenched his fists and shouted profanities, he did not physically threaten anyone. That incident did not change Dr. Kania's opinion as to defendant's capability of functioning outside the hospital on release. Although defendant was upset, he had not broken anything or assaulted anyone.

Dr. Kania had interviewed defendant a few days before the pruno incident, and had not known about it at the time of his evaluation. Learning of the pruno incident also did not change Dr. Kania's opinion as to defendant's suitability for release. Dr. Kania did not change his opinion, because "there was nothing in the record up until February 4th when I saw him [the pruno incident took place afterward, on February 6,

2014] that indicated there had even been a problem with him using drugs at the hospital or giving any dirty test. He had been there for three years. There was no indication of any problem."

Dr. Kania had interviewed defendant for about one and one-half or two hours. Dr. Kania disagreed that, "all things being equal, a doctor who has more information would be in a better position to make a conclusion." He maintained, "That is the whole reason for a second opinion in whatever field of medicine, psychology included. Second opinions mean that you have fresh eyes looking at it, [with] no preconceived ideas, no culture of the institution that can change someone's perception." Dr. Kania also felt that defendant's sobriety was not a key factor in evaluating his dangerousness.

Dr. Kania relied a great deal on the history and information he obtained from defendant. For example, defendant told Dr. Kania that he attended 12-step meetings twice a week. In fact, however, defendant had attended an average of only one meeting per month. Dr. Kania did not feel that the difference between what defendant reported and his actual attendance made any substantial difference and did not affect his ultimate opinion.

Defendant's father testified on defendant's behalf. The father indicated that defendant had lived sometimes with him and sometimes with defendant's mother as defendant was growing up. The father had also had his own problems with chemical dependency. He had been addicted to methamphetamine and alcohol in the past. The

14

father had been unable to help defendant with drug addiction in the past because of his own issues with drug dependency.

Now, if defendant were to be released, the father would be able to advise defendant to continue to take his antipsychotic medications, and he was "sure" that defendant would continue to take his prescribed medications. If defendant stopped taking his medications, if his schizophrenia symptoms returned, and if defendant were to abuse drugs and alcohol, the father would be able to recognize the signs and to take defendant to a psychiatrist for treatment. Among the signs he would watch for were if defendant "get[s] agitated, aggressive; if he starts isolating; if he starts becoming depressed; if he quits eating; if he quits sleeping; if he has mood swings. I can recognize those signs."

On cross-examination, the father indicated that he had been in sober recovery for about five years in 2010 when the commitment offense occurred. Inferably, the father was not prevented, by his own struggles with addiction, from recognizing or addressing defendant's addiction or mental health issues at that time. At the time of the offense, the father attempted to address defendant's problems by talking to him. Now, however, he and defendant had a better relationship and he would be able to take defendant to NA or AA meetings.

Defendant's mother also testified on his behalf. Although the father's testimony gave the impression that defendant had spent approximately equal time in the custody of each parent, the mother testified that she and the father divorced when defendant was two years old, and that defendant had resided primarily with her while he was growing up.

15

The mother had been aware that, when defendant was a teenager, he was abusing alcohol. She did not know that he was abusing other drugs. She became aware of defendant's mental health issues when he was first hospitalized at age 15 or 16. Defendant was first given antipsychotic medication after a later hospitalization. The medication may have helped, but the mother had difficulty getting defendant to take his medication. He never took the medication regularly.

As warning signs of defendant's mental health problems, the mother was aware that he would stop eating or he would become agitated. Although defendant did not take his medication regularly when he was a teenager, the mother believed that defendant now recognized his mental illness and he knew that the medication helped. Defendant had been taking his medication in the hospital setting since his admission to Patton. The mother was of the opinion that defendant had no difficulty controlling any dangerous behavior. The mother had no doubt that an incident like the commitment offense would never happen again. Although she acknowledged that circumstances might arise that could lead defendant to decompensate, she believed that defendant had proven during his stay at Patton that he could do well.

C. *Trial Court's Ruling*

After hearing argument from counsel, the trial court announced its decision. The court stated that, when a person is committed to a state hospital after a finding of not guilty by reason of insanity, "There has to be an understanding by the individual about his mental disease or defect, what the triggers are, what is needed to control it, and how

16

his mental disease, defect, and disorder is exacerbated by the use of controlled substances and alcohol." The court expected some sort of progression in the patient's understanding, "so that you can have some confidence that when he is released from that structured environment, he is able to continue on that path."

The court was concerned that, "In order . . . to find that he is able to be released, the court has to find that he is, at the present time, no longer a danger to himself or to other people related to his mental disease, defect, disorder today." The court credited the testimony of the experts that defendant did suffer from a mental disease, defect or disorder, and that he also had a "polysubstance abuse problem." Defendant had done reasonably well in a structured setting, but "[t]he question is will he be able to continue if he is released."

The court's assessment of the evidence was that defendant's behavior had changed for the worse in about July 2013. Before then, defendant had been progressing well, but afterward he became "fragmented and not as focused on his disease, the triggers, and the substance abuse but more about getting out." Defendant's participation in his recovery groups fell off dramatically. The staff treating defendant noticed the significant downturn in defendant's conduct, and could not recommend him even for the semi-structured program of conditional release.

The court found that "the evidence is sufficient to prove beyond a reasonable doubt that at the present time, . . . [defendant] does suffer from a mental disease, defect, and disorder. And by reason of that mental disease, defect, and disorder, he is a danger to

17

himself and presents a substantial danger of physical harm to others if he were to be released presently. And that is within the meaning of Penal Code section 1026.5 (b). [¶] I hereby order that the defendant's commitment is extended for a period of two years from the date of termination of the previous commitment, which is March 21st, 2014. So the commitment is extended to March 20, 2016."

Defendant contends that the court's ruling was erroneous in several respects.

### III. The Trial Court's Ruling to Extend Defendant's Commitment Was Proper

#### A. *The Trial Court Applied the Proper Burden of Proof*

Defendant seizes upon some of the language of the trial court's ruling to argue that the court improperly inverted the burden of proof: rather than requiring the People to prove beyond a reasonable doubt that defendant, at the time of the hearing, posed a substantial danger of physical harm to others, the court in essence required defendant to show that he did not currently pose a danger to society and that he would continue in the future not to pose such a danger.

Defendant also urges that the evidence showed only that he "theoretically" could relapse into drug and alcohol use. Defendant in essence argues that reliance on any evidence of his past behavior or attempts to predict his future conduct are speculative, and thus are not evidence to support a finding or conclusion as to his present condition. He maintains that the "legally required focus of the extension proceeding and required findings was [defendant's] condition at the time of the proceeding, not past conditions or future hypothesis." (Citing *People v. McCune* (1995) 37 Cal.App.4th 686, 693.)

18

Defendant's reliance on *McCune* is misplaced. While the court did state that the focus of the extension inquiry was the patient's condition at the time of the proceeding, nothing in *McCune* precludes an examination of past conduct, mental health history, or future mental health prognosis as aids in assessing the patient's current condition. A patient's history is essential to both diagnosis and prognosis. In turn, no expert could possibly venture an opinion as to the patient's current likelihood of dangerousness, in the absence of such diagnosis and prognosis. "Given certain facts, predictions of future dangerousness may be rationally projected and the drawing of such an inference is properly within the expertise of a qualified mental health expert like [Dr. Ilas and Dr. Matty]." (*People v. Mapp* (1983) 150 Cal.App.3d 346, 352.)

Contrary to defendant's contention, the trial court did not "fail[] to focus on the requirement that the People show beyond a reasonable doubt that at the time of the proceeding, [defendant] still had a serious difficulty in controlling dangerous behavior . . . ." The court did properly place the burden on the People to produce evidence showing that defendant lacked the ability to control his dangerous behavior. (See *People v. Zapisek, supra,* 147 Cal.App.4th 1151, 1165 [to satisfy due process concerns, the People must show "at the very least," that the defendant has "serious difficulty controlling his potentially dangerous behavior"].)

19

B. *The Evidence Was Sufficient to Support the Commitment Extension*

Reviewing the evidence, as we must, in the light most favorable to the trial court's ruling, we conclude that the evidence was fully sufficient to support the extension order. "Testimony by mental health experts . . . will often be the only way to establish whether [the requisite] dangerousness exists." (*People v. Bennett* (1982) 131 Cal.App.3d 488, 497.) "One single recent act of violence unrelated to the original crime, or a single psychiatric opinion that an individual is dangerous as a result of a mental disorder, constitutes substantial evidence to support an extension." (*People v. Superior Court (Williams)* (1991) 233 Cal.App.3d 477, 490, overruled on another point in *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 828.)

In defendant's case, he had two significant diagnoses: schizophrenia, which manifested in hallucinations and paranoia, and polysubstance abuse. The polysubstance abuse was not in remission, given defendant's fall-off in attendance and participation in sobriety treatment programs, and given his very recent involvement in the possession of inmate-made alcohol (pruno). Defendant's abuse of alcohol and other intoxicants rendered him dangerous in and of itself, and his drug and alcohol abuse exacerbated the dangerousness of his primary diagnosis of schizophrenia.

Defendant claims that all the experts agreed that his schizophrenia was in remission, but this misrepresents the record. Defendant had been compliant with taking his medication under strictly controlled circumstances. His hallucinations and disorganized thoughts were "in remission," but his underlying disease of schizophrenia

20

was not. Defendant's history showed that he did not take his prescribed antipsychotic medications in an uncontrolled setting, and the failure to take his medication contributed to his decompensation and the violent crime he committed against his father. The parallel diagnosis of polysubstance abuse made it more likely that he would stop taking his antipsychotic medication. As noted, schizophrenia with paranoid delusions is a well-known risk, in and of itself, for violent behavior. Like many others who suffer from schizophrenia, defendant had little or no understanding of either the illness or the importance of continued treatment. "That is why," as Dr. Ilas testified, "there are so many relapses and hospitalizations for schizophrenia."

Dr. Matty concurred that defendant could not safely be released from a secure treatment setting. Given defendant's recent lapses in the course of treatment for polysubstance abuse (lack of attendance at programs, multiple refusals to drug test, recent possession of pruno), defendant had evident difficulty controlling his behavior with respect to substance abuse. Defendant's release plan was wholly inadequate; he appeared to depend on magical thinking, that nothing would happen, instead of understanding and preparing for inevitable stressors, triggers, coping mechanisms, and treatment options.

The evidence before the court was fully sufficient to establish that defendant suffered from a mental disease, disorder, or defect, that he was dangerous to the public as a result of the mental disease, disorder, or defect, and that he lacked the ability to control his dangerous conduct in an unrestricted setting. Indeed, he was manifestly unable, at least as to the diagnosis of polysubstance abuse, to control his conduct even within a

21

restricted setting.  Because the evidence was sufficient to support the trial court's findings, the commitment order will be affirmed.

C.  *Defendant Failed to Establish the Affirmative Defense That He Would Take His Medication in an Unsupervised Environment*

Defendant refers to the jury instruction, CALCRIM No. 3453, which states that "Control of a mental condition through medication is a defense to a petition to extend commitment.  To establish this defense, [defendant] must prove by a preponderance of the evidence that:  [¶]  1. (He/She) no longer poses a substantial danger of physical harm to others because (he/she) is now taking medicine that controls (his/her) mental condition; [¶] AND [¶] 2. (He/She) will continue to take that medicine in an unsupervised environment."

Defendant maintains that he met the standard to establish this defense.  First, defendant points to the prosecution's evidence, stating that "Both the prosecution's experts conceded that [defendant's] medication was working and that there was no evidence from his time at Patton to suggest anything other than [defendant's] intent to continue to take it in the future."  Second, defendant points to the defense expert, Dr. Kania, who opined that defendant's schizophrenia was in remission, that he had taken his medications in the hospital for an extended time, and that defendant now saw the benefit of taking his medication, so that he would continue to take the medication if released.

22

As to the first point, the record does not support defendant's characterization of the experts' opinions. For one thing, defendant cites a report to the court from 2011 on the issue whether defendant was competent to stand trial in the underlying criminal proceedings. The evaluator at that time found that defendant posed a moderate danger to others, although he had been stabilized on his medication. The evaluator recommended that defendant be continued on his medication if he were discharged from the hospital to stand trial. This evaluator did not express any opinion as to defendant's ability in 2014 to continue to take his medication in an unstructured setting. Indeed, the report had nothing to do with, and was irrelevant to, the issues at the extension hearing.

As to Dr. Ilas and Dr. Matty, the record shows that, contrary to defendant's characterization of their testimony, neither prosecution expert felt any confidence that defendant would be able to continue taking his medication regularly in an unstructured setting. Dr. Ilas testified that defendant's auditory hallucinations and disorganized thoughts—i.e., overt symptoms of schizophrenia—were in remission, but his underlying disease of schizophrenia was not. He opined that defendant did not understand the nature of the illness or the importance of treatment, and went on to say, "That is why there are so many relapses and hospitalizations for schizophrenia." Far from conceding that there was no evidence that defendant would not take his medication in the future, Dr. Ilas specifically stated that defendant had "a strong history of noncompliance with medical or other modalities." Dr. Matty did agree that defendant had not refused to take his medication in the hospital setting, but she could only speak to defendant's compliance in

23

the structured environment of the hospital.  In an unstructured setting, Dr. Matty was concerned, based primarily on defendant's history, that he would not take his medication. The testimony of the prosecution experts directly contradicts defendant's claim that they conceded his ability to continue on his medication in an unsupervised setting.  Their opinions were supported by substantial evidence; the prosecution experts' testimony alone is sufficient to defeat defendant's claim to have proven the medication defense.

As to the second line of evidence, Dr. Kania's opinion, the trial court evidently did not credit that testimony over that of the prosecution's witnesses.  *If* the trial court had believed Dr. Kania over the prosecution experts on the issue of defendant's likelihood of continuing to take his medication in an unsupervised setting, that opinion might constitute substantial evidence to support a finding that defendant had proven his medication defense.  But the court manifestly did not give greater credit to Dr. Kania's opinion, and we do not reweigh the evidence on appeal.  (*Nicholas Laboratories, LLC v. Chen* (2011) 199 Cal.App.4th 1240, 1253.)

Defendant failed to establish the affirmative defense that he would continue to take his medication in an unstructured, unsupervised environment.  The trial court did not err in imposing the extension order.

## DISPOSITION

The trial court's order extending defendant's mental health commitment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

KING
J.

MILLER
J.